DOC #359

U.S. DISTRICT COURT
FILED
JUL 1 3 2015
DS
S.D. OF N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

        -against-

CARMINE PERSICO,
                 Defendant.
-------------------------------------------------------------X

**NOTICE OF MOTION**

Case No. 85-cr-00139

     PLEASE TAKE NOTICE that upon the attached affirmation of Anthony DiPietro Esq., the accompanying memorandum of law, and the previous papers filed and proceedings had herein, Petitioner Carmine Persico shall move this Court, located at 500 Pearl Street, New York, N.Y. 10007, at a date and time convenient to the Court, for an Order:

1. Vacating his 100-year sentence pursuant to Fed. R. Crim. P. 35(a);

2. For any other relief that is necessary and proper.

Dated: White Plains, New York
      July 13, 2015

Anthony DiPietro
*Counsel to Carmine Persico*
Law Office of Anthony DiPietro
15 Chester Avenue
White Plains, New York 10601
(914) 948-3242

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

          -against-

CARMINE PERSICO,

                    Defendant.

------------------------------------------------------------X

                                  <u>AFFIRMATION OF COUNSEL</u>

                                     Case No. 85-cr-00139

ANTHONY DIPIETRO, an attorney licensed to practice law in the State of New York and a member of the bar of this Court, hereby declares under penalties of perjury that the following facts are true:

1. I represent the Petitioner Carmine Persico in his current motion to set aside his 100-year sentence pursuant to Fed. R. Crim. P. 35(a).

2. I am familiar with the facts and circumstances of Mr. Persico's underlying criminal case, based upon, <u>inter alia</u>, review of the relevant transcripts, pleadings, and conversations with Mr. Persico.

3. The facts pertinent to resolution of Mr. Persico's motion are set forth in the accompanying memorandum of law and supporting exhibits.

4. An evidentiary hearing is requested.

Dated: White Plains, New York
      July 13, 2015

                                        _____
                                        Anthony DiPietro
                                        *Counsel to Carmine Persico*
                                        Law Office of Anthony DiPietro
                                        15 Chester Avenue
                                        White Plains, New York 10601
                                        (914) 948-3242

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

              -against-

                                               Case No. 85-cr-00139

CARMINE PERSICO,
                       Defendant.
-------------------------------------------------------------X


MEMORANDUM OF LAW IN SUPPORT OF CARMINE PERSICO'S
MOTION PURSUANT TO FED. R. CRIM. P. 35(a)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................... 1

I. RELEVANT FACTS

    A.  HISTORICAL BACKGROUND .............................................. 5

    B.  PROCEDURAL HISTORY ................................................... 11

II. BRADY VIOLATIONS

    A.  THE GOVERNMENT FAILED TO DISCLOSE EVIDENCE PROVING THAT
        CARMINE PERSICO WAS NOT THE "BOSS" OF THE COLOMBO FAMILY .... 22

    B.  THE GOVERNMENT FAILED TO DISCLOSE EVIDENCE PROVING THAT
        ANTHONY SALERNO WAS NOT THE "BOSS" OF THE GENOVESE FAMILY..31

    C.  THE GOVERNMENT FAILED TO DISCLOSE EVIDENCE PROVING THAT
        CHRISTOPHER FURNARI AND GENNARO LANGELLA WERE NOT MEMBERS
        OF THE "COMMISSION" ..................................................... 35

    D.  THE GOVERNMENT FAILED TO DISCLOSE EVIDENCE PROVING THAT THE
        KILLING OF A "BOSS" DOES NOT REQUIRE THE APPROVAL OF THE
        "COMMISSION" ............................................................ 36

    E.  THE GOVERNMENT FAILED TO DISCLOSE EVIDENCE PROVING THAT
        CARMINE PERSICO WAS NOT INVOLVED IN THE MURDERS OF MARY BARI
        AND THOMAS SPERO ...................................................... 38

    F.  THE GOVERNMENT FAILED TO DISCLOSE INFORMATION SUGGESTING
        THAT THE U.S. ATTORNEY'S OFFICE HAD ENLISTED ROGUE FBI AGENT
        LINDLEY DEVECCHIO AND HIS SERIAL KILLER INFORMANT GREGORY
        SCARPA, SR., TO GATHER EVIDENCE IN THE "COMMISSION CASE" .......... 40

    G.  THE GOVERNMENT FAILED TO DISCLOSE EVIDENCE PROVING THAT FRED
        DECHRISTOPHER COMMITTED PERJURY REGARDING HIS MOTIVE FOR
        COOPERATING AGAINST CARMINE PERSICO ............................... 44

H. THE GOVERNMENT FAILED TO DISCLOSE EVIDENCE THAT FBI AGENT
JOSEPH PISTONE HAD PARTICIPATED IN ACTS OF VIOLENCE, EXTORTION,
OBSTRUCTION OF JUSTICE, HIJACKINGS, AND A CONSPIRACY TO MURDER
BRUNO INDELICATO ............................................................................... 47

III. APPLICATION OF LAW

A. MR. PERSICO'S 100-YEAR SENTENCE IS "SUBSTANTIVELY
UNREASONABLE" UNDER THE SIXTH AMENDMENT OF THE UNITED
STATES CONSTITUTION .......................................................................... 49

B. MR. PERSICO'S 100-YEAR SENTENCE IS "ILLEGAL" UNDER THE FIFTH
AMENDMENT'S DUE PROCESS CLAUSE ...................................................... 51

C. MR. PERSICO'S 100-YEAR SENTENCE IS "CONSTITUTIONALLY
DEFECTIVE," AS A RESULT OF THE GOVERNMENT'S FAILURE TO DISCLOSE
EXCULPATORY EVIDENCE ....................................................................... 56

D. ADDITIONAL DISCOVERY SHOULD BE ORDERED BY THE COURT PRIOR TO
THE ADJUDICATION OF MR. PERSICO'S MOTION FOR SENTENCING RELIEF
PURSUANT TO FED. R. CRIM. P. 35(A).................................................... 67

CONCLUSION ............................................................................................... 68

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

     -against-

                                      Case No. 85-cr-00139

CARMINE PERSICO,
                      Defendant.
------------------------------------------------------------X

## PRELIMINARY STATEMENT

Petitioner Carmine Persico respectfully requests that the Court vacate his 100-year sentence pursuant to Federal Rule of Criminal Procedure 35(a),[1] because the sentence imposed by the Court was (1) "substantively unreasonable" under the Sixth Amendment, (2) predicated upon a number of factual inaccuracies in violation of the Fifth Amendment's Due Process Clause, and (3) constitutionally defective as a result of the Government's failure to disclose favorable information under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.[2]

---

[1] The pre-guideline version of Rule 35(a), which still applies to pre-guideline cases, provides that "the court may correct an illegal sentence at any time." United States v. Lopez, 26 F.3d 512, 517 n. 6 (5th Cir. 1994); see also United States v. Blacker, 909 F.2d 66, 67 (2d Cir. 1990), vacated on other grounds, 499 U.S. 944 (1991) ("former Rule 35(a) remains applicable to offenses…committed prior to November 1, 1987.")

[2] An "illegal sentence" is "one which is not authorized by the judgment of conviction, or is in excess of the permissible statutory penalty for the crime, or is in violation of the Constitution." United States v. Johnson, 988 F.2d 941, 943 (9th Cir. 1993) (emphasis added); see also United States v. Huss, 520 F.2d 598, 602 (2d Cir. 1975) (holding that an "illegal sentence" is a sentence in excess of a statutory provision or otherwise contrary to the Constitution or applicable laws) (emphasis added).

Since his conviction, Mr. Persico has discovered a wellspring of undisclosed Brady evidence demonstrating his actual innocence of the uncharged murders that were the predicate for his de facto 100-year sentence, and further, that he was innocent of the pivotal allegation in the "Commission Case"--that he was the "boss" of the Colombo crime family and a member of the Mafia's "Commission" between 1972 to 1985.[3]

Specifically, the Government possessed, but failed to disclose, highly exculpatory evidence proving that (1) Mr. Persico was never the "boss" of the Colombo family; (2) Mr. Persico did not authorize others to act as "boss" of the Colombo family; (3) the "Commission" had appointed another "boss" of the Colombo family; and (4) Mr. Persico did not aid or abet his co-defendants Anthony Salerno, Christopher Furnari, or Gennaro Langella in any charged RICO offenses, since these individuals were also not members of the "Commission" during the timeframe charged in the indictment.

The Government also intentionally failed to produce favorable information that it gathered from a number of "reliable" sources proving that Mr. Persico (1) did not participate in a "Commission" vote concerning the murder of Carmine Galante in 1979, (2) did not sanction the murder of Thomas "Shorty" Spero, and (3) did not authorize the murder of Mary Bari, who was actually killed by the lead

---

[3] The indictment alleged the existence of a RICO enterprise known as the "Commission" of La Cosa Nostra that operated in the New York City area through five organized crime "families."

FBI case agent Lindley DeVecchio, and his untrustworthy serial killer informant, Gregory Scarpa, Sr. [4]

In addition to these salient withholdings, the Government further concealed information relating to the credibility of its investigation and key trial witnesses, which included evidence demonstrating that (1) rogue FBI agent Lindley DeVecchio gathered a majority of the information used to prosecute the "Commission Case" from serial killer, Gregory Scarpa Sr., (2) key cooperating witness, Fred DeChristopher's true motive to cooperate in the "Commission Case" stemmed solely from his involvement in stealing a large sum of money from Mr. Persico, and (3) FBI Agent Joseph Pistone had participated in undisclosed acts of

---

[4] In 1997, it was first revealed that Gregory Scarpa, Sr., served as an informant for the FBI since 1961. During his decades-long tenure as a "top echelon" informant, Scarpa committed numerous acts of violence and murder of which his FBI handlers were complicity involved:

> "Not only did the FBI shield Scarpa from prosecution for his own crimes, they also actively recruited him to participate in crimes under their direction. That a thug like Scarpa would be employed by the federal government to beat witnesses and threaten them at gunpoint to obtain information regarding the deaths of civil rights workers in the south in the early 1960s is a shocking demonstration of the government's unacceptable willingness to employ criminality to fight crime. It is redolent of the current mindset of some in the government who argue that the practice of terror and torture can be freely employed against those the government claims are terrorists themselves: that it is permissible to make men scream in the name of national security. These are shortcuts that devalue legitimate police work, their yield is insignificant and the cost to the fundamental values they debase is enormous."

People v. Devecchio, 2007 N.Y. Misc. LEXIS 7827, *3-4 (N.Y. Sup. Ct. 2007)

violence, extortion, obstruction of justice, hijackings, and a conspiracy to murder Mr. Persico's co-defendant, Bruno Indelicato.

As a result of its intentional concealment of <u>Brady</u> evidence, the Government was able to obscure the truth-seeking process during Mr. Persico's sentencing proceeding, and in doing so, deprive Mr. Persico of his federal due process right to be sentenced solely on the basis of accurate information. Mr. Persico's 100-year sentence was ultimately based upon speculative suppositions and falsehoods concerning his criminal history, and as a result, it must be set aside.

After three decades, it is time for the Government to finally answer for its wrongdoings, and explain its (1) failure to disclose highly exculpatory evidence to Mr. Persico's defense, and (2) use of salaciously false allegations during Mr. Persico's sentencing. Mr. Persico has served 30 years of a 100-year sentence when wrongfully concealed evidence would mitigate his sentencing culpability and demonstrate that all cornerstones of his sentence were provably false.

The Court's duty to rectify the constitutional violations perpetrated by the Government during Mr. Persico's sentencing proceeding cannot be overstated, since the life and liberty of a human being lay in the balance, and the historical integrity of this judicial proceeding remains undefined.[5] The Constitution simply

---

[5] The United States District Court (SDNY) has determined that the "Commission" case is of "historical interest," representative of the different time periods in the Court's history and illustrative of "the changing work of the District Court." <u>See</u> <u>Cases of Historical Interest in the United States for the Southern District of New York</u>, p. 11, <u>available at</u> http://history.nysd.uscourts.gov ("According to the New York Times, the case 'attained national significance as the

4

does not allow the Court to escape its duty of examining whether Mr. Persico has been deprived of his fundamental right to life, liberty, and due process of law.

Mr. Persico's 100-year sentence gains no validity from the passage of time. And the notion of justice and fair play is an undying legal principle that serves no rule of finality under the Constitution of the United States of America.[6]

## I. RELEVANT FACTS

### A. HISTORICAL BACKGROUND

In the 1980s, there was groundless furor amongst certain members of the Department of Justice (DOJ) and the Federal Bureau of Investigation (FBI) to combat Italian organized crime--dubbed by the DOJ as the "Mafia." See Michael Arena, et. al., Series: Pt. 1 The Mob on trial, Newsday (Sept. 7, 1986) ("Cosa Nostra investigations based on the RICO statute had been under way in New York since 1980, when Robert Blakey, a law professor who helped draft the statute, showed the FBI how to use RICO to pursue the mob").

At the forefront of this crusade was former United States Attorney Rudolph Giuliani, who was "gunning for the mob" after being armed with the RICO

---

first case to focus on the commission of top crime leaders, portrayed by the prosecution as 'the board of directors' of the Mafia, or La Cosa Nostra.'")

[6] There are simply no time limitations set upon a Court to review facts that affected the "validity and regularity" of a life sentence imposed upon a criminal defendant. The "conventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged." Sanders v. United States, 373 U.S. 1, 8 (1963); see also Moore v. Dempsey, 261 U.S. 86, 92 (1923) (The Court cannot escape its "duty of examining the facts for [itself] when if true as alleged they make the trial absolutely void").

statute. Id. ("With Giuliani's arrival in 1983, as U.S. Attorney for New York's Southern District, the FBI found an enthusiastic prosecutor, and Italian-American from Brooklyn who resented the stereotypes the Cosa Nostra encouraged").

Mr. Giuliani's unchecked targeting of alleged members of the "Mafia"--later revealed by multiple investigative journalist to have been a politically motivated ploy in order to cover his own family's ties to such an organization--became the catalyst for an unprecedented number of RICO prosecutions involving defendants of Italian descent in the Southern District of New York during the 1980s.[7] See, e.g., Wayne Barrett and Adam Fifield, Rudy!: An Investigative Biography of Rudolph Giuliani 467 (2000) ("By gaining control of the information around him, and cowing those who knew him, he has over the years manufactured a life story....The father he celebrated so often was a pathological predator. His extended family harbored a junkie, crooked cop and murky mob wing"); Rudy

---

[7] Giuliani's longstanding history of engaging in misconduct does not bespeak of an exemplary prosecutor, who undertakes great care in his or her duty of seeking truth and justice. See e.g., Jack Newfield. The Full Rudy: The Man, the Myth, the Mania 83 (2002) (Rudy could "understand a cop telling a white lie to make an arrest work..."); Id. at 115 ("In an effort to discredit the victim [of a police shooting] before his funeral, Giuliani instructed his police commissioner to [illegally] make public [the victim's]...sealed juvenile arrest record...[although] there was noting in the arrest record punishable by anything more serious than a summons. There was nothing nearly as serious as the adult criminal record of Giuliani's own father, who served sixteen months in Sing Sing Prison for armed robbery...."); Michael Powell and Russ Buettner, In Matters Big and Small, Crossing Giuliani Had Price, N.Y. Times (January 22, 2008) ("Rudolph W. Giuliani likens himself to a boxer who never takes a punch without swinging back. As mayor, he made the vengeful roundhouse an instrument of government, clipping anyone who crossed him.")

Giuliani the babble-rouser, New York Daily News, February 21, 2015 (observing that "Giuliani's father did time in Sing Sing for robbing a milkman, served as enforcer for a loan-sharking operation, [and] that Giuliani," following the pattern of his father and five uncles in world War II, "secured [phony] draft deferments to avoid serving in the Vietnam War").

In 1982, Giuliani began to coordinate with the DOJ to "develop a major push against organized crime" as a political scheme "centered around a possible Presidential address." U.S. DOJ Memorandum, dated July 29, 1982 (Exhibit 1). Mr. Giuliani and his "Yes-Rudy" associates decided that the most effective approach would be to somehow "link the organized crime and narcotics problems" and form a "White Commission on Organized Crime" bolstered by a "major presidential speech" to convince the American people that resources should be designated in this area as an attempt to duplicate those of other narcotic task forces nationwide. Id; see also Michael Powell, A Crime Buster, With His Eye on the Future, N.Y. Times (December 10, 2007) ("Mr. Giuliani armored himself with a tight band of lawyers and investigators, men known as the Yes Rudys!"); Peter Lance, Deal with the Devil: The FBI's Secret Thirty-year Relationship with a Mafia Killer 175 (2013) (Giuliani's approach was "to wipe out the five families.")

At a meeting held in his office on July 29, 1982, Giuliani and other members of the Government highlighted their "investigative priorities" concerning the "Mafia" and outlined the success that was "achieved during 1981 and 1982 in the fight against the number one priority target--LCN." Exhibit 1, at 2 (FBI

7

Organized Crime Program 1981 & 1982 Synopsis). The DOJ expressly cited Mr. Persico's 1981 parole violation and resulting incarceration as one of its exemplary achievements. Id. at 3.

As of 1983, Giuliani began spearheading the DOJ's investigation into the New York "Mob," intensifying the implicit bounty put on Mr. Persico's freedom. Immediately upon taking command of the U.S. Attorney's Office (S.D.N.Y.), Giuliani began to assemble a team seeking to secure federal indictments against Mr. Persico that would carry very long prison sentences. Michael Powell, A Crime Buster, With His Eye on the Future, N.Y. Times (December 10, 2007) ("Mr. Giuliani, who was 38 when he became United States attorney in 1983, threatened his targets with long prison sentences, and he infuriated judges with leaks of grand jury testimony to the press").

According to a former Giuliani insider, the medieval crusade exhibited by Giuliani towards Mr. Persico was not uncharacteristic, given that "when Rudy sees a need to take someone out, he has a machine, a room full of henchmen, nicking away at you, leaking crazy stories. He is not bound by the truth. I have studied animal life, and their predator/prey relations are more graceful than his...." Jack Newfield, The Full Rudy: The Man, the Myth, the Mania 57 (2002).

Amongst the inducted members of Giuliani's organized crew to target Mr. Persico, were rogue FBI Agent Lindley DeVecchio, and his serial killer informant

8

Gregory Scarpa Sr.,[8] who together committed multiple acts of violence and murder.[9]

In a recent memoir, DeVecchio recalled, "It would be 1986 before the commission would be fully exposed and proven to be a criminal enterprise in Rudy Giuliani's Mafia Commission Case, which I was very proud to have served on as the FBI case supervisor." At the time, "Jim Kossler, Jule Bonavalonta, and Rudy

---

[8] Unbeknownst to Mr. Persico's defense, Giuliani had occasionally mingled with DeVecchio's key informant--Gregory Scarpa Sr., at social events and weddings. During his work as a FBI informant, Scarpa Sr., was an associate of Leo & Lewis D'Avanzo [Rudy's uncle and first cousin], whom were known criminals in the "Mafia" underworld. See Anton Chaitkin, The Rudy Bomb--Defused, Executive Intelligence Review (November 23, 1987) ("Harold Giuliani went to work in 1948 for Helen's brother Leo D'Avanzo, as an enforcer for Leo's loan-sharking, numbers, and other betting operations. Harold's nephew and crime cohort Lewis D'Avanzo [Rudy's first cousin] forged documents and apparently carried out murders, in a giant car-theft scheme under the Luchese crime ring. In 1977, D'Avanzo was shot to death by the FBI, when he tried to run his car over an arresting agent").

[9] In The Lost Son, Bernard Kerik, former NY Police Commissioner, recalled when Mayor Giuliani appointed him the DOC commissioner. Kerik explained that Giuliani had conducted the affair as if he was the boss of a "Mafia" family. Giuliani led Kerik to a dimly lit room where the Mayor's aides were assembled:

> "The door opened, and the first one to come through was the deputy mayor, Peter Powers. I stood to say hello and he shook my hand and said, 'Congratulations.' Then he pulled me over and kissed me on the check. He already knew. Next was Randy Mastro, the mayor's chief of staff. He did the same. In this dark sitting room, one by one, the mayor's closest staff members came forward and kissed me. They all knew. I know the mayor is as big a fan of The Godfather as I am, and I wonder if he noticed how much becoming part of his team resembled becoming part of a Mafia family. I was being made. I was now a part of the Giuliani family, getting the endorsement of the other family members, the other capos...."

Bernard Kerik, The Lost Son: A Life in Pursuit of Justice 253 (2001).

9

Giuliani, then U.S. attorney for Manhattan, and some other honchos *sat me down in Rudy's Office and invited me to supervise a case they'd dreamed up, the Mafia Commission case."* Lin DeVecchio and Charles Brandt, We're Going to Win This Thing: The Shocking Frame-up of a Mafia Crime Buster 145 (2011) (*emphasis added*).

Headed by Giuliani and case agent DeVecchio,[10] the U.S. Attorney's Office (S.D.N.Y.) ultimately charged Mr. Persico in two separate federal indictments, falsely claiming that he was the "boss" of the Colombo family and headed a RICO conspiracy, along with related extortion offenses, from 1972 to 1985. See United States v. Salerno, No. SSS 85 Cr. 139 (RO) (charging, among other things, extortionate conspiracy and substantive extortions, 18 U.S.C. § 1951; and labor bribery); compare to United States v. Persico, et al., No. S 84 Cr. 809 (JFK) (charging, among other things, conspiracy to extort money from construction companies, 18 U.S.C. § 1951; extortion of construction companies, 18 U.S.C. §§ 1951-2; and labor bribery.)

The U.S. Attorney's Office (S.D.N.Y.) succeeded in prosecuting both indictments against Mr. Persico over his double jeopardy objections, even though both indictments charged Mr. Persico with membership in a factually identical "criminal enterprise that extorted payments from construction companies involved

---

[10] Gregory Scarpa Sr., was recognized as the key source of information utilized by the Government to obtain wiretaps, indictments, and other trial evidence in the "Commission" Case. The Government paid Scarpa lucratively for his unreliable information, and provided thousands of dollars in lump sum payments to maintain Scarpa's enthusiasm in reaching the "results desired" by the DOJ. See FBI Reports, at Exhibit 2 (collecting examples).

in concrete-pouring jobs in New York." [11] United States v. Langella, 804 F.2d 185, 188 (2d Cir. 1986).

The Second Circuit was convinced, however, that Giuliani's office had properly charged two separate enterprises: "the *Persico* indictment concerned the 'Colombo Family of La Cosa Nostra,' whereas the *Salerno* indictment alleges as the pertinent enterprise the 'Commission of La Cosa Nostra.'" Id. at 189. The Circuit concluded, "the activities of the Colombo Family, which were the subject of the Persico indictment, were centered in New York, New Jersey, and Florida, [while] [t]he Salerno enterprise is nationwide and international in scope." Id. at 190.

B. PROCEDURAL HISTORY

On November 19, 1986, Mr. Persico was found guilty of RICO conspiracy, pursuant to 18 U.S.C. § 1962(d) (1982), and substantive RICO, 18 U.S.C. §

---

[11] A former member of the Eastern District Organized Crime Strike Force (John Jacobs, Esq.) once submitted an affidavit in United States v. Persico, et al., 84 Cr. 809 (JFK), representing that the S.D.N.Y. had an atypical interest in maintaining jurisdiction over judicial proceedings involving Mr. Persico.

Prior to the filing of the indictment in United States v. Persico, et al., 84 Cr. 809 (JFK), Giuliani travelled to Washington D.C., to convince members of the DOJ that his office should be allowed to prosecute Mr. Persico, although the E.D.N.Y. had asserted jurisdiction over the matter. Given Giuliani's political connections, members of the DOJ took the unprecedented stance of ordering the E.D.N.Y. to transfer the case to Giuliani in the S.D.N.Y.

Thereafter, Giuliani utilized Mr. Persico's guilty plea from a prior E.D.N.Y. case as substantive proof of the RICO enterprise charged in United States v. Persico, et al., No. S 84 Cr. During internal DOJ meetings, representatives of the E.D.N.Y. unsuccessfully protested Giuliani's decision to use Mr. Persico's prior guilty plea as substantive proof, arguing that it was fundamentally unfair to the accused and undercut the integrity of the plea bargaining process in its district.

1962(c) (1982), violations, after a jury trial. Mr. Persico was convicted of conspiracy to commit extortion and twelve counts of extortion or attempted extortion, in violation of 18 U.S.C. § 1951(a) (1982), along with aiding and abetting, 18 U.S.C. § 2 (1982), in six labor bribery violations, 29 U.S.C. § 186(b)(1) (Supp. IV 1986).

At trial, the Government alleged that Mr. Persico was a member of a RICO enterprise known as the "Commission," which was purportedly membered by the bosses of the "Mafia" and constituted the ruling body over the other alleged crime families in the United States. The Government claimed that Mr. Persico was the "boss" of the Colombo family since 1972, and sat on the "Commission" solely as a result of such status. See Gov't Sentencing Memorandum at 22 (December 22, 1986) ("In 1971, Joe Colombo was gunned down at Columbus Circle at the direction of the rival Gallo faction, and, after a short period, Carmine Persico became Boss of the Family, and, as a result, became a full voting member of the Commission").

The Government also claimed that "the Commission was dominated by four men: Anthony Salerno ("Undisputed Boss of the Genovese Family"); Paul Castellano (Boss of the Gambino Family); Anthony Carallo (Boss of the Luchese Family); and Carmine Persico (Boss of the Colombo Family)." Id. at 6.

During opening arguments, the Government told the jury:

"In the case of Carmine Persico, Jr., you are going to hear, for reasons that are going to come out during the trial, that 'Junior' Persico was not around for a number of years that are covered

during the course of this case in the late 70's and during the early 80's. You are going to learn even when 'Junior' Persico was not around, not available to meet with the other defendants, he still kept in touch. He still was able to run his family and participate in the activities of the Commission." Tr. 27.

In its case-in-chief, the Government elicited testimony from cooperating witness Joseph Cantulopo to prove that Mr. Persico became the "boss" of the Colombo family in 1972, and had directed others to act on his behalf as "boss" for "Commission" affairs whenever he was unavailable as a result of his incarceration. Tr. 930-933, 935, 1123. Cooperator Cantulopo testified that in 1972, he was told that "the wheel has turned, the Colombo boys are on the bottom now and the Persicos are on the top." Tr. at 930.

The Government further alleged that Mr. Persico and the other "Commission" members engaged in a extortion and labor bribery operation known as the "Club," which was a cooperative venture among the "Mafia Families" to "allow only certain construction companies as the Commission approved to be permitted to take concrete construction jobs worth more than two million dollars in New York City." United States v. Salerno, 868 F.2d 524, 529 (2d Cir. 1989). The Government claimed that concrete companies would be required to follow the rules set forth by the "Club" and "any contractor taking a concrete job worth more than two million dollars would be required to pay the Commission two percent of the construction contract price." Id.

In addition, the Government alleged that the "Commission" had been involved in the murder of Carmine Galante and his associates, Giuseppe Turano

13

and Leonard Coppola, on July 12, 1979. Although Mr. Persico was not charged with this offense, or any other murder, the Government claimed that all members of the "Commission" agreed to end the internal Bonanno family dispute between Galante and Philip Rastelli, who were allegedly in a personal rivalry for being the "boss" of the Bonanno family. The Government alleged that the "violent elimination of Galante as 'boss' of the Bonanno family was related to the 'Commission' function of resolving leadership disputes within a family." Salerno, 868 F.2d at 533.

The key evidence proffered by the Government to connect the triple murder to the "Commission" came from the testimony of cooperating witness Fred DeChristopher, who testified that Mr. Persico had allegedly admitted to him that "he had voted against the Galante murder" as a member of the "Commission" in 1979. Salerno, 868 F.2d at 533.

On December 22, 1986, the Government filed a sentencing memorandum recommending that Mr. Persico be sentenced to a term of imprisonment that would remove him from society permanently. See Gov't Sentencing Memorandum at 49. The Government suggested that Mr. Persico, along with his codefendants, "occupied the highest ranks of the Mafia" and the Court's imposition of a draconian sentence would be viewed as a "benchmark, against all other sentences will be measured." Id. at 50.

The Government further stated that Mr. Persico's sentencing proceeding "provides an opportunity not only to punish [him] for [his] predatory and lawless

career, but also send a message to other members of La Cosa Nostra and those contemplating membership…."Id. at 1-2. The Government explained, "symbolic dimension of sentencing suggests that there is value in imposing prison terms that these defendants will not be physically capable of completing." Id. at 51.

The Government argued that Mr. Persico should receive a stiff prison sentence because the proof at trial established that he had undertaken a longstanding reign as "boss" of the Colombo family. The Government again explained, that after a short period from the shooting of Joe Colombo, Mr. Persico became the "boss" of the family in 1972, and as a result, became a member of the "Commission." Id. at 8, 23.

In addition, the Government contented that it was its obligation to bring to the Court's attention all relevant information of the offense and characteristics of Mr. Persico, which were not disclosed during the guilt phase of the case. Id. at 2. The Government told the Court it should consider allegations concerning uncharged criminal conduct when contemplating an appropriate sentence for Mr. Persico. Id. at 19-25.

Specifically, the Government represented to the Court that Mr. Persico had not only voted on the Galante murder in 1979, but had ordered other members of the Colombo family to carry out murders during his alleged reign as "boss," including that he provided the orders to kill Mary Bari on September 25, 1985 and Thomas "Shorty" Spero in 1980. Id. at 23.

Aside from its sentencing submission, the Government submitted a 13-page

memorandum to the U.S. Probation Department that outlined its "version of the offense," which was incorporated into the Presentence Report issued to the sentencing judge.  In its memo, the Government repeated its argument that the evidence showed that "Carmine Persico has been the Boss of the Colombo family since approximately 1972 following the shooting in June 1971 of Joseph Colombo in Columbus Circle. Although incarcerated twice since 1972, Persico remained the Boss, but was assisted in managing his Family's affairs by close subordinates who remained on the street." Gov't Presentence Memo, at 5.

The Government further contended that the triple murder involving Carmine Galante was ordered by the "Commission" as part of its unique power to order the murder of a "boss." Id. at 10-13. The Government claimed that at the time of these murders, Persico, along with certain co-defendants, "were all top leaders of La Cosa Nostra and well aware of its power to order the murder of a Boss." Id. at 12-13. The Government again reiterated that Mr. Persico had voted on the murder of Galante as a commission member. Id. at 12.  The Government represented that the testimony of FBI Agent Joseph Pistone supported this contention, revealing that the "Commission was directing the affairs and making the decisions about the leadership of the Bonnano Family at the time of the murders." Id.

Ultimately, the U.S. Probation Department implicitly adopted the Government's synopsis, writing in its Presentence Investigation Report that "the Commission resolved a leadership dispute within the Bonanno Family" by

authorizing the murder of Carmine Galante and "authorized certain other murders." <u>See</u> Presentence Inv. Report, at 6-7.

On <u>January 13, 1987</u>, the Court sentenced Mr. Persico to a total of 100 years in prison for his alleged role as a member of the "Commission," and his alleged involvement in the "Club" bid-rigging scheme involving concrete construction contractors in New York City.[12] <u>See</u> <u>Salerno</u>, 868 F.2d at 542-543 (observing that Mr. Persico received consecutive twenty year sentences for Count I (RICO conspiracy), Count 2 (substantive RICO), Count 4 (extortion), Count 12 (extortion), and Count 14 (extortion)).

The Court claimed that the 100-year sentence imposed upon Mr. Persico was without consideration to the allegations contained in the Government's sentencing memorandum. <u>See</u> Sentencing Tr. at 14. The Court stated that it "barely absorbed the narrative form that the government gave" in its sentencing memorandum, and it was "not relying on that in any sentence so you need not deal with anything that is in there." <u>Id.</u>

Nonetheless, the sentencing judge did consider the Presentence Investigation Report issued by the U.S. Department of Probation, which ultimately contained both the Government's memorandum and the unfounded allegation that the "Commission" was responsible for "certain other murders" in

---

[12] As of 1987, Mr. Persico stood sentenced to 139 years in prison as a result of the two "extortion/bid rigging" prosecutions in the S.D.N.Y., although he was not convicted of committing a violent offense.

addition to the charged triple murder involving Carmine Galante.

In adherence to the rhetoric contained in the Government's sentencing submissions, the Court explained that it needed to "fashion something that is a statement to those out there, some of whose names on probably (<u>sic</u>) these tapes but were not in this courtroom who are undoubtedly thinking about taking over the reins from hands that have to may let them drop (<u>sic</u>), assuming that have let them drop already. Maybe they have, maybe they haven't. But the sentence has to be in a fashion that speaks to them." <u>Id</u>. at 19; <u>compare</u> <u>to</u> Gov't Sentencing Memorandum at 1-2.

In addition, the Court followed the Government's inaccurate narrative holding Mr. Persico responsible for being the "boss" of the Colombo family since 1972, although he was largely imprisoned during the 1970s and early 1980s. <u>Id.</u> at 24. The Court also found that Mr. Persico should be held accountable for his alleged involvement in committing uncharged acts of violence and murder during such timeframe.

Specifically, the Court expressed that it had taken into account the Government's allegations that Mr. Persico had profited for years by "being an upper member of this echelon, on the board of directors that lives, *succeeds on murder*, violence and *threats of murder* and violence and retiring, as I say, when circumstances permit, to the estate at Saugerties." <u>Id.</u> at 24-25 (*emphasis added*).

The Court also found true the Government's uncharged allegation that Mr. Persico had voted on whether the "Commission" should authorize the killing of

Carmine Galante. Specifically, the Court stated, "No question that you were a Commission member either up there or by proxy, using its services. According to DeChristopher, *you sanctioned the use of killing for appropriate circumstances*, although in this case of Mr. Galante you apparently voted against it according to what you told Mr. DeChristopher." Id. at 24 (*emphasis added*)

Notably, Mr. Persico presented written objections to the Court taking consideration of uncharged murder allegations when deciding the appropriate sentence to be imposed. See Letters from Carmine Persico to Hon. Judge Richard Owen, dated December 29, 1986 and January 6, 1987 (Exhibit 3). Mr. Persico not only set forth specific objections to all of the uncharged murder allegations contained in the Government's sentencing submissions, but he further requested that the filing be completely stricken from the record. Id. In addition, Mr. Persico also voiced his objection to a "bulk of the presentence report" during his sentencing proceeding. See Sentencing Tr. at 28.

Mr. Persico told the Court that he objected "to the bulk" of the report, and requested that it not follow him to any correctional institution as being part of his Bureau of Prison (BOP) file, since it contained factually untrue allegations that could affect, among other things, his BOP designation and parole status. [13] Id.

In response, the Court did not specifically address any of Mr. Persico's

---

[13] On June 4, 1996, the Government wrote to the U.S. Parole Commission that it was its intention to intervene in all parole proceedings involving Mr. Persico to ensure that he would be banned from ever returning to society as a result of his conviction in the instant case. See Gov't Letter, dated June 4, 1996 (Exhibit 4).

objections, although it was required under Rule 32(c)(3)(D) to either make a specific finding resolving the dispute or determine that no such finding is necessary because the controverted matter will not be considered in sentencing.[14] Id. In fact, the sentencing judge issued its 100-year sentence upon Mr. Persico without even first considering his objections. See Sentencing Tr. 27 ("Mr. Persico, I didn't ask you, but you didn't make anything of it. In that presentence report is there anything you objected to that you want me to take issue on?")

On January 31, 1989, the Second Circuit affirmed both Mr. Persico's conviction and sentence. The Circuit concluded, among other things, that there was sufficient evidence proving the "Club's" extortion operation, and that the "Commission" had required that all "Club" members pay the two percent tribute for conducting business on certain contracts. Salerno, 868 F.2d at 530-531.

---

[14] Fed.R.Crim.P. 32(c)(3)(D), applicable to offenses committed prior to November 1, 1987, provides that:

> If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

United States v. Weintraub, 871 F.2d at 1266 (5th Cir. Tex. 1989)

In regard to the uncharged Galante murder, a majority of the Court's panel held that "there was adequate evidence to support the jury's determination that the Galante murders occurred 'in the conduct of [the Commission's] affairs' within the meaning of 18 U.S.C. § 1962(c) (1982)." Id. at 533-534. The panel credited the Government's position that the testimony of DeChristopher provided "foreknowledge of the boss of the Colombo family," and "evidence that the Commission had taken a vote on the matter" as "it retained for itself an exclusive prerogative to approve any murders of family bosses." Id.

In addition, the Court concluded that Mr. Persico's 100-year sentence did not violate the Eighth Amendment, nor was improperly mechanistic or uniform as a result of all co-defendants (except Bruno Indelicato) receiving identical 100-year sentences. Id. at 543. The Court was unconvinced "that Judge Owen relied so heavily on abstract considerations of deterrence and so little on considerations of individual circumstances as to amount to an abuse of his wide discretion in sentencing."[15] Id.

In dissent, however, Honorable Judge Myron H. Bright noted that he could not agree with the panel's decision that adequate proof existed to connect the

---

[15] To public observers, however, the Court's uniformed imposition of a 100-year sentence may be seen as further evidence illustrating palpable judicial bias against the accused. See Harvey A. Silverglate, Three Felonies a Day: How the Feds Target the Innocent 110 (2009) (Judge Richard Owen, appointed to the federal bench in 1973, was "widely reputed to be one of the most pro-prosecution judges in the entire federal court system," and at times, showed palpable bias against the accused "with a varying degree of frankness" that many observers could see his "marked pro-prosecution bent").

Galante murder to the "Commission." Judge Bright observed that the Government's proof rested upon nothing more than an analogy to the movie, "The Godfather," and "a movie script does not constitute the kind of proof required to sentence men to prison for one hundred years." Id. at 545-546. Judge Bright also noted, "testimony that the 'common law' of the La Cosa Nostra requires Commission authorization before a family boss can be killed does not prove that the 'law' was observed in Galante's case." Id. at 546.

## II. BRADY VIOLATIONS

### A. THE GOVERNMENT FAILED TO DISCLOSE EVIDENCE PROVING THAT CARMINE PERSICO WAS NOT THE "BOSS" OF THE COLOMBO FAMILY

The Government's "Commission Case" was built upon the theory that Carmine Persico was a member of the "Commission" after being anointed "boss" of the Colombo family in 1972. The individual racketeering acts charged against Mr. Persico in *Salerno* extended from September 1978 to 1984, with the addition of the uncharged 1979 triple murder accusation involving Carmine Galante. United States v. Langella, 804 F.2d 185, 190 (2d Cir. 1986).

According to recently unearthed FBI Reports, however, Mr. Persico was not the "boss" of the Colombo family, and could not have been a member of the "Commission" during the timeframe charged in the indictment. In this regard, Mr. Persico could not have conspired with other "Commission" members to carry out the enterprise's affairs, or participated in a vote concerning the murder of Carmine Galante in 1979.

In 1971, the FBI received undisclosed information that Joseph Yacovelli was "a member of the Commission, having taken Joe Colombo's spot, [and] was proposed as Boss" of the Colombo family. See FBI Report (Exhibit 5).

On September 24, 1971, the FBI also received information from an informant that Yackovelli "had requested to be allowed to step down as boss of the Colombo family stating he disliked the pressures being brought to bear on him since he has been designated boss." FBI Report, dated 9/24/1971 (Exhibit 6). The informant further advised that Yacovelli's request was granted, and Vincent Aloi was "designated boss with Yacovelli to serve as Consiglieri." Id.

In 1972, the Government received additional information confirming that Vincent Aloi had "been made boss of the Colombo family" and was "no longer considered an acting boss." FBI Report, dated 5/23/1972 (Exhibit 7).

On August 11, 1972, the FBI was further advised from its sources that Yackovelli would have authority to make important decisions regarding Colombo family affairs, although Aloi was appointed "boss." See DOJ Report, dated August 11, 1972 (Exhibit 8) (reporting that an alleged member of the Colombo family had stated "that while Aloi is boss, Yacovelli calls the shots").

As of October 1972, the FBI was advised that "Vincent Aloi was stepping down as acting boss because he 'couldn't take the heat' and that Joe Yackovelli, consiglieri, would take over as acting boss." FBI Report, dated 10/27/72 (Exhibit 9, at p. 2). Another undisclosed FBI source also reported that Joseph Yackovelli was "officially designated as the new boss of the Colombo family on Saturday

23

4/22/72." FBI Report, dated 6/20/1972 (Exhibit 10, at p. 2); see also FBI Report, dated 4/25/1972 (Exhibit 11) (reporting that Yackovelli was officially named "boss" of the Colombo family).

At such time, the FBI received additional information that Joseph Yackovelli was "a member of the commission, having taken Joseph Colombo's spot" when he was proposed as "boss" of the Colombo family in 1972. See FBI Report, dated 1/22/1973 (Exhibit 12); see also FBI Report, dated 10/27/72 (Exhibit 9, at p. 3) (Joseph Yacovelli is "currently a member of the Commision, having taken Joe Colombo's spot").

In 1973, the Government received information from its informant, NY 3461-C-TE, about new changes made within the hierarchy of the Colombo family. During the FBI's debriefing of NY 3461-C-TE, it learned that the new "boss" of the Colombo family was Thomas Di Bella. FBI Report, dated 1/3/73 (Exhibit 13, at p. *3) (informant was surprised at the news of Di Bella's appointment to "boss" of the Colombo family since "Joseph Colombo was still alive").

Informant NY 3461-C-TE also told the FBI that a meeting "was attended by most of the active soldiers in the Colombo family of LCN. At this meet it was 'officially' announced that the 'family' was now structured as follows: Boss-Thomas Di Bella; Underboss- Anthony Abbetemarco; Consiglieri- Not appointed to date." FBI Report, dated 2/5/73 (Exhibit 14, at p. *3-4).

Notably, the FBI reported that NY 3461-C-TE did not mention "*Carmine Persico*" when describing the hierarchy of the Colombo family. Id. at *4 (*emphasis*

added); see also FBI Report, dated 7/31/73 (Exhibit 15) (reporting the ruling leadership of the Colombo family *without mention of Carmine Persico*).

In the summer of 1973, the Government received additional information from three other undisclosed sources that Thomas Di Bella was the "boss" of Colombo family, and had been appointed boss by the "Commission" itself, which was then headed by the alleged "boss" of the Gambino family, Carlo Gambino:

> On June 4, 1973, NY T-1 advised that Thomas Di Bella has been designated permanent new Boss of the Colombo La Cosa Nostra (LCN) Family by Carlo Gambino.
>
> On July 12, 1973, NY T-2 confirmed the above.
>
> On August 7, 1973, NY T-3 advised that Thomas Di Bella was still Boss of the Colombo LCN Family.

FBI Report, dated 8/22/1973 (Exhibit 16, at p. 1-2).

In 1974, the Government also received undisclosed information that Di Bella continued to be the "true boss" of the Colombo family, and that Mr. Persico was not an active member of the Colombo family due to his incarceration. See FBI Report, dated 1/8/1974 (Exhibit 17, at p. *2) ("On September 13, 1973, NY T-2 advised that Thomas Di Bella is consolidating his power as the true boss of the Joseph Colombo La Cosa Nostra (LCN) family although the Persico sympathizers are still very influential. According to source, *it has become apparent that Carmine Persico cannot control the family from his jail cell* in the view of his brother's, Alphonse Persico's, ineffectiveness") (*emphasis added*).

25

Additional information received by the Government in 1974 reaffirmed that the "Commission" directed Di Bella's appointment as "true boss" of the Colombo family:

> On June 7, 1974, NY T-2 advised that one of the reasons Thomas Di Bella was made 'boss' of the Colombo Family because of his close friendship with Carlo Gambino. Gambino had threatened to take over the entire Family if a boss was appointed who he found unsuitable.

> On March 14, 1974, NY T-4 advised that Thomas Di Bella was firmly established as boss of the Colombo family.

FBI Report, dated 7/26/1974 (Exhibit 18, at p. *2).

At such time, a FBI source also reported, "Thomas Di Bella has been heard to remark that he should have his 'head examined' for taking over as boss of the Colombo La Cosa Nostra (LCN) Family." FBI Report, dated 7/26/74 (Exhibit 19, at p. *3). And, the FBI source "confirmed that Abbatemarco was slated to take over job of boss if and when Di Bella went to jail," Id. at 4, or Di Bella would appoint Joseph Brancata as "boss." See FBI Report, dated 9/11/1974 (Exhibit 20) ("Past several days, Colombo member source NY 3461-CTE advised of imminent changes in the hierarchy of the Colombo LCN Family due to pending prosecutive problems of certain family leader. This date source advised that caporegime Joseph Brancato has been appointed acting boss in view of Thomas Di Bella's incarceration for contempt").

In addition to information regarding Di Bella's leadership, the FBI also gathered evidence suggesting that Joseph Yackovelli continued to be the "boss" of

26

the Colombo family throughout <u>the early 1970s</u>. According to an FBI Report, dated 3/7/74 (Exhibit 21), a source told the Government that Yackovelli even exercised his power as "boss" over Persico:

> "A couple of months ago Yackovelli sent word to Persico that [   ]. Yackovelli told Persico that he (Yackovelli) is boss and when he needs things, people are to respond."

<u>By the end of 1974</u>, the Government had received a wellspring of additional undisclosed information suggesting that Carmine Persico was definitely not the "boss" of the Colombo family, and held no power to make any decisions within the enterprise.[16] <u>See</u> US Gov't Memorandum, dated 11/4/74 (Exhibit 22, at p. 2) ("The word on the street is that the Persico faction is 'out' in the Colombo power circles and that Joe Brancato appears to be the low key figure the Family has been seeking as a leader for several years"); FBI Report, dated 3/1/1975 (Exhibit 24, at p. *4) ("The informant advised that since Di Bella is permanent Boss of the Colombo Family, Abbatemarco, their underboss and formerly acting boss for Joseph Brancato, (a former captain), was made acting boss, no major decisions would be made without consultation among the triad").

As of 1975, the FBI received information, according to its "reliable sources," that Mr. Persico was not authorizing or participating in any murders, nor did any alleged Colombo member seek his approval to carry out such offenses. As confirmed by multiple FBI sources, Mr. Persico was simply not the "boss" of

---

[16] <u>See also</u> FBI Reports, dated 6/5/1974, and 9/7/1974, and 8/30/1974 (Exhibit 23) (reporting Thomas Di Bella as undisputed "boss" of the Colombo family in 1974).

the Colombo family in 1975, and as a result, he held no authority to make important decisions. See FBI Report, dated 3/1/1975 (Exhibit 24, at p. *2) ("On 8/12/74, [ ] advised that Tony Peraino is in contact with incarcerated Colombo Boss, Thomas Di Bella, and is attempting to get Di Bella's approval to 'wack out' [ ]"); FBI Report, dated 3/1/1975 (Exhibit 25, at p. 3) ("Source advised further that George Tropiano was attempting to get approval from Acting Boss Joe Brancato to have a 'witness' hit").

As referenced in another FBI report, dated 3/1/1975 (Exhibit 26, at p. 2), "reliable informants" again reported that Thomas Di Bella was currently the boss of the Joseph Colombo LCN Family, Anthony Abbatemarco is currently underboss, and Joseph Brancato is acting boss in place of Di Bella, while the latter is incarcerated." In addition, the Government continued to develop information that "Colombo members 'have the feeling' that Joe Yackovelli is definitely influencing family policies although remaining in the background."[17] FBI Report, dated 3/1/1975 (Exhibit 25, at p. 3)

In 1976, the Government continued to receive undisclosed information "that Joseph Brancato continues to act in behalf of Di Bella and that he remained firmly placed as boss of the Colombo family." FBI Report, dated January 27, 1976 (Exhibit 28, at p. *3). According to FBI sources, "Brancato took orders from Di Bella and insured that the latter's instructions were carried out." Id.

---

[17] See also FBI Reports, dated 4/18/1975, and 4/21/1975, and 10/14/1975 (Exhibit 27) (reporting Thomas Di Bella as undisputed "boss" of the Colombo family in 1975).

As of 1977, the Government reported that its sources advised that the "five families of LCN continue to operate in the NYC area" and the Bosses of other New York families are Genovese Boss Frank Tieri, Luchese boss Carmine Tramunti (incarcerated), *Colombo boss Thomas Di Bella*." FBI Report, dated 1/21/77 (Exhibit 29) (*emphasis added*).

In addition, the FBI also reported that Carmine Persico was not the "boss" as of January 21, 1997, and at best, was only an alleged capo ("incarcerated") in the Colombo family--who ranked at the bottom of the FBI's list when describing the hierarchy of the enterprise. Id. at *2. Specifically, undisclosed FBI sources identified the following individuals as holding positions of leadership in the Colombo family:[18]

| | |
|---|---|
| Thomas Di Bella | Boss |
| Anthony Abbatemarco | Underboss |
| Alphonse Persico | Consiglieri |
| Joe Colombo | Former Boss (Permanently Incapacitated) |
| Joseph Brancato | Capodecina |
| Charles Panerella | Capodecina |
| Vincent Muce | Capodecina |
| Aniello Giannattasio | Capodecina |
| Vincent Gugliaro | Capodecina |
| Salvatore Lombardino | Capodecina |
| James Clemenza | Capodecina |
| John Franzese | Capodecina (Incarcerated) |
| Carmine Persico | Capodecina (Incarcerated). |

Id. (Exhibit 29, at p. *2).

---

[18] Contrary the theory presented by prosecutors in the "Commission Case," the FBI's sources never claimed Mr. Persico to be the "boss" of the Colombo family in the 1970s, or that others were "acting boss" on his behalf during such timeframe.

From 1980 to 1983, the Government also received additional source information suggesting that Carmine Persico was never made the "boss" of the Colombo family at any time between 1970 to 1981. See FBI Report, dated 3/9/1982 (Exhibit 30) ("The source advised that the former Colombo family boss, Thomas Di Bella, who was the boss of the family prior to 1981..."); FBI Report, dated 8/26/1980 (Exhibit 31) ("On August 26, 1980, NY 3461-TE advised SA R. Lindley DeVecchio that the following is a current breakdown of the Colombo Family structure: Boss Thomas Dibella"); DOJ Report, dated July 29, 1982 (Exhibit 1, at p. *3) ("Colombo Family- The 'boss' of the Colombo family, Alphonse Persico, has been convicted...is currently in a fugitive status having forfeited a $250,000 bond.")

In 1980, case agent Lindley DeVecchio was also directly told from an undisclosed source that it was not until November 5, 1980 that the "Commission" first requested that Thomas Di Bella step down as "boss" of the Colombo family. FBI Report, dated 11/5/1980 (Exhibit 32).

Most troubling, the undisclosed information received by the case agent in 1980 demonstrates that the Government was well aware that Mr. Persico was not a member of the "Commission" as of November 5, 1980, and as a result, was factually innocent of (1) all extortion charges in the "Commission" occurring between 1978-1980, and (2) the alleged conspiracy to murder Carmine Galante occurring in 1979.

B. The Government Failed to Disclose Evidence Proving That Anthony Salerno Was Not the "Boss" of the Genovese Family

Another principal allegation of the Government's racketeering case was that Anthony Salerno was the "undisputed boss" of the Genovese family during the entire timeframe charged in the indictment. See e.g. Gov't Sentencing Memorandum at 6. The Government's case rested on the theory that the respective bosses of each family held potions as "Commission" members, and each member aided and abetted each other in carrying out the enterprise's mission of extortion, labor bribery, loan sharking, and murder.

According to recently unearthed FBI Reports, however, Mr. Salerno was not the "boss" of the Genovese family, and could not have been a member of the "Commission" during the relevant timeframe charged in the indictment. In this regard, Mr. Salerno could not have been aided and abetted by Mr. Persico to carry out the affairs of the "Commission," or to engage in any criminal conduct during the timeframe charged in the indictment, including taking part in a vote to murder Carmine Galante in 1979.

In 1975, the Government received undisclosed information from its sources indicating that Anthony Salerno was not the head of the Genovese family, or in control of any related "Commission" affairs regarding the other "Mafia" families. Specifically, the FBI was advised, "Lilo Galante is definitely the new boss of the old Bonanno family. *He has been sanctioned as boss by Funzi Tieri (Genovese Head)*, and [ ] *Di Bella of the Colombo family*." FBI Report, dated 1/31/75 (Exhibit 33) (*emphasis added*).

31

<u>In 1977</u>, the FBI also issued an "Anti-Racketeering Memorandum" that identified the alleged "boss" of each "Mafia" family. The Government report claimed that its sources furnished "reliable" information proving that "the five families of the LCN continue to operate in the NYC area. Carlo Gambino, head of the Gambino family, died of natural causes on 10/15/1976. New boss of family Paul Castellano. Carmine Galante now heads the Bonanno family. Bosses of the other New York families are *Genovese boss Frank Tieri*, Luchese boss Carmine Tramunti (incarcerated), *Colombo boss Thomas Di Bella*." FBI Report, dated 1/21/77 (Exhibit 29) (*emphasis added*).

<u>As of 1980</u>, the Government received additional source information confirming that individuals other than Salerno held the position of "boss" of the Genovese family. Specifically, a source advised case agent Lindley DeVecchio that the "source has known Frank 'Funzi' Tieri of the Genovese family in excess of ten years," and based upon conversations held in his presence, "Tieri has been the boss of the Genovese LCN Family for approximately 8 years" which occurred after "Tieri replaced Thomas Eboli, after Eboli's murder in 1972." FBI Memorandum, dated 12/19/1980 (Exhibit 34, at p. *2).

In addition, case agent DeVecchio, was also advised that all criminal activities "are directly under the control of Tieri, since he controls the family," and "*all murders* by the Genovese Family are approved by Tieri." <u>Id.</u> (*emphasis added*).

<u>In 1981</u>, Government source NY 3461-TE also reported to case agent DeVecchio that "Benny Squint appears to be the new head of the Genovese

32

Family." FBI Memorandum, 11/27/81 (Exhibit 35); see also FBI Report (Exhibit 36) (On July 28, 1981, source advised that "Benny Squint" appears to be head of the Genovese family).

    As of 1984, case agent DeVecchio received additional information concerning the leadership of the Genovese family. At such time, the FBI was implicitly told that Anthony Salerno was not the "boss" of the Genovese family, and a different leader had been established. According to an undisclosed FBI report, "NY 3461-TE advised case agent R. Lindley DeVecchio that Vincent 'Chin' Gigante has been definitely established as the boss of the Genovese Family." FBI Memorandum, dated 1/17/84 (Exhibit 37, at p. *2).

    In 1985, the Government also possessed, but failed to disclose, audio recordings of Anthony Salerno, which solidified the fact that someone else led the Genovese family as "boss" during the early 1980s. During a unrelated federal racketeering and murder trial in 1997, assistants from the U.S. Attorney's Office for Eastern District alleged that Vincent "the Chin" Gigante was in fact running the Genovese crime family during much of the period covered in the 'Commission' case" and during the trial, "an assistant U.S. Attorney played a tape of a conversation at Salerno's social club in 1984, in which *Salerno referred to Gigante as the boss*," Wayne Barrett and Adam Fifield, Rudy!: An Investigative Biography of Rudolph Giuliani 155 (2000) (*emphasis added*).

    At Gigante's federal trial, the Government also presented the sworn testimony of Philadelphia crime family boss Philip Leonetti, who testified "Gigante

had took over as boss of the Genovese family in early 1980." Id.

In 1988, the Government also presented the sworn testimony of Genovese capo, Vincent "The Fish" Cafaro before a U.S. Senate Subcommittee. Cooperator Cafaro testified at the hearing that Salerno was once the boss, but that he had been demoted in 1981 after a stroke. According to Cafaro, "Gigante allowed Fat Tony to continue to front as boss." Id.

In 2003, the Government again received confirmation that Salerno was not the boss of the Genovese Family during the timeframe charged in Giuliani's "Mafia Commission Case," and he could not have participated with Mr. Persico in any alleged vote concerning the murder of Carmine Galante. In a FBI 302, it was revealed that cooperator Frank Lino told the FBI that shortly after the murder of Carmine Galante in 1979, he "*went with Bindelicato to see Vincent "Chin" Gigante, Boss of the Genovese family....*" FBI 302, dated 7/03/03 (Exhibit 38, at p. *2) (*emphasis added*).

Ultimately, the Government successfully prosecuted Gigante of being the "boss" of the Genovese family during the late 1970s and early 1980s, and he was imprisoned for twelve years as a result of the jury's findings. See Barrett, supra, at 155. In this regard, "a federal jury had implicitly found that Rudy Giuliani convicted the wrong man [Anthony Salerno] as boss of the most powerful crime family in New York." Id.

C. The Government failed to disclose evidence proving that Christopher Furnari and Gennaro Langella were not members of the "Commission"

In addition to Government falsehoods concerning the leadership of the Colombo and Genovese families, the FBI also concealed the fact that Christopher Furnari and Gennaro Langella did not sit on the "Commission." The Government falsely alleged at trial that Furnari and Langella--aided and abetted by Mr. Persico and other "Commission" members--engaged in substantive RICO offenses between 1978 to 1984. United States v. Langella, 804 F.2d 185, 190 (2d Cir. 1986).

As of 1980, however, the FBI had received information that both Furnari and Langella were mere capos in their respective families, and neither held a high-ranking position that would permit their membership in the "Commission." FBI Report, dated August 26, 1980 (Exhibit 39). Specifically, a FBI source advised case agent Lindley DeVecchio that "Jerry Langella, a *Colombo Capo*, has been meeting with *Luchese Capo* Chris Furnari at the 19th Hole…Brooklyn, New York…." Id. (*emphasis added*).

On November 11, 1980, a FBI source also advised case agent DeVecchio that Gennaro Langella was not the "underboss" of the Colombo family at such time, although the Government had routinely claimed that Langella held such a position since early 1980. FBI Report dated 11/5/1980 (Exhibit 32) (noting that "no underboss" for the Colombo family "has been named at this time").

In 1995, the Government admitted to the Court that Furnari's Presentence

Investigation Report was wrong, and should be corrected to excise any reference to him being a member of the "Commission" during the late 1970s and early 1980s. The Government conceded that it now believed that "Furnari was only capo, and not a Luchese representative on the 'Commission'" at such time. See Letter from AUSA David N. Kelley to David Breitbart, dated December 4, 1995 (Exhibit 40).

The Government implicitly conceded that the information presented at the "Commission" trial was false, as new reliable sources confirmed that Furnari "could not have sat on the Commission" during the entire timeframe charged in Giuliani's "Mafia Commission Case." Id. Amongst the Government's new sources was cooperator Alphonse D'Arco, "a longtime member of the Luchese Family who also served as capo and acting boss." Id. When testifying in unrelated federal trials, the Government presented D'Arco's sworn testimony identifying "Furnari" as only a Luchese capo, who "did not become a consiglieri until the early eighties." Id.

Of greatest significance, the Government now admits, "Furnari was *not* a Luchese representative on the Commission *at the time of the Galente (sic) homicide*." Id.

D. THE GOVERNMENT FAILED TO DISCLOSE EVIDENCE PROVING THAT THE KILLING OF A "BOSS" DOES NOT REQUIRE THE APPROVAL OF THE "COMMISSION"

At trial, the Government contended that the "Commission" was the only authority to sanction the killing of a "Mafia boss." The admission of evidence concerning the triple murder involving alleged Bonanno "boss" Carmine Galante rested solely upon this principle. The Government claimed that the "Commission"

voted upon Galante's murder, and without doing so, no member of the "Mafia" would be permitted to carry out the execution unless willing to face personal execution for not obtaining "Commission" approval.

Both the Court and U.S. Department of Probation adopted the Government's theory when determining the appropriate sentence for Mr. Persico. See Procedural History, supra at 16-20. The Government's theory, however, was false and directly contradicted by undisclosed information received by the FBI in 1985 relating to the murder of another alleged "Commission" member, and "Mafia" boss Paul Castellano.

Specifically, case agent Lindley DeVecchio, received undisclosed information that murder of Paul Castellano was set up by John Gotti and Frank De Cicco. FBI Report, dated 12/17/1985 (Exhibit 41, at p. *2). An FBI source told DeVecchio that his information came from De Cicco, and "boss Carmine Persico was aware of the plans to hit Castellano," but Persico *neither approved nor disapproved of the hit....*"Id. (*emphasis added*).

This exculpatory information demonstrates, among other things, that either the "Commission" did not automatically vote on the killing of a "boss"--contrary to the principle theory represented by the Government in the "Commission Case" concerning the murder of Carmine Galante--or Mr. Persico was not a member of the "Commission" in 1985 since he did not take any position on Castellano's murder as would be required of a "Commission" member when the murder of a "boss" is proposed by another "Mafia" family.

Had this information been disclosed, the likelihood of Mr. Persico's success in precluding the sentencing judge from considering the Galante murder would have been considerably greater. See Salerno, 868 F.2d 546 (Bright, dissenting) ("testimony that the 'common law' of the La Cosa Nostra requires Commission authorization before a family boss can be killed does not prove that the 'law' was observed in Galante's case").

E. THE GOVERNMENT FAILED TO DISCLOSE EVIDENCE PROVING THAT CARMINE PERSICO WAS NOT INVOLVED IN THE MURDERS OF MARY BARI AND THOMAS SPERO

At sentencing, the Government alleged that Mr. Persico was responsible for ordering a number of murders as the alleged "boss" of the Colombo family. However, the Government failed to disclose that serial killer Gregory Scarpa Sr., was the Government's key source of information regarding these murder allegations--some of which were the same murder offenses that were later alleged by the Brooklyn District Attorney to have been committed by FBI agent DeVecchio and Scarpa. See Alan Feur, For Ex-F.B.I. Agent Accused in Murder, a Case of What Might Have Been, N.Y. Times (April 15, 2006) (noting that a 2006 New York State indictment filed in Brooklyn, N.Y., charged that DeVecchio stepped "across the line, helping a Mafia informant kill at least four people").

One of the calculated murders committed by the rogue duo--case agent DeVecchio and Scarpa--included the homicide of Mary Bari, which was falsely attributed to Mr. Persico at the time of his sentencing. According to one investigative journalist, Bari had been marked for death after case agent Lin

DeVecchio went to Scarpa's house on Avenue J and told him, "we have a problem with…Mary Bari….You have to take care of this….she's going to be a problem." Lance, <u>supra</u>, at 120.

Aside from Mary Bari, the Government also concealed evidence showing that agent DeVecchio was in possession of information that would conclusively prove that Mr. Persico was innocent of the murder of Thomas "Shorty" Spero.

<u>On August 12, 1980</u>, an FBI informant advised agent DeVecchio "that the hits on Ralph and Shortie Spero (sic) were carried out by Genovese member Jerry Pappa, as a result of extensive junk deals with Ralph Spero." FBI Memorandum, dated 10/8/1980 (Exhibit 42, at p. 2).

Instead of disclosing this <u>Brady</u> information, the U.S. Attorney's Office falsely told the Court at sentencing that once Mr. Persico "was released from prison in 1979," and in reasserting full control over the family, he "put out a contract on 'Shorty' Spero for disloyal activities while Persico was in jail." <u>See</u> Gov't Sentencing Memorandum at 23. The prosecutor told the Court that the contract issued by Mr. Persico to kill Thomas Spero "was carried out by Gerry Langella's crew." <u>Id.</u>

Several years later, however, the U.S. Attorney's Office accused Vincent Gigante, alleged "boss" of the Genovese family, of ordering the murder of Thomas Spero. At an unrelated federal trial, the U.S. Attorney's Office presented the testimony of Genovese turncoat, Peter Savino who admitted that he was personally responsible for carrying out the Spero murder. <u>See</u> <u>United States v.</u>

Venero Mangano, et al. 90-Cr-446 (RJD), Trial Transcript at 1070-74 (May 6, 1991) (Exhibit 43) (Savino answering that he was involved in the killing of Thomas "Shorty" Spero); Letter from AUSA Charles E. Rose to Hon. Raymind J. Dearie, dated April 26, 1991, United States v. Venero Mangano, et al. 90-Cr-446 (RJD) (Exhibit 44, at p. 2) ("Following his agreement to cooperate fully, he [Savino] admitted [that] he…and others were responsible for the Spero murders")

At no time did the U.S. Attorney's Office disclose any of the exculpatory information it had gathered since October 8, 1980, although it falsely accused Mr. Persico for being responsible for Mr. Spero's murder during his sentencing in the "Commission Case."

Instead of fulfilling its ethical and legal obligations, the U.S. Attorney's Office has allowed, for the last thirty years, Mr. Persico--a factually innocent man-- to stand accused in publicly accessible court documents of a murder that he did not commit.

F.  THE GOVERNMENT FAILED TO DISCLOSE INFORMATION SUGGESTING THAT THE U.S. ATTORNEY'S OFFICE HAD ENLISTED ROGUE FBI AGENT LINDLEY DEVECCHIO AND HIS SERIAL KILLER INFORMANT GREGORY SCARPA, SR., TO GATHER EVIDENCE IN THE "COMMISSION CASE"

The Government suppressed evidence suggesting that lead case agent Lindley DeVecchio had enlisted serial killer Gregory Scarpa, Sr., to gather the evidence needed to build the "Commission case" as a favor to former U.S. Attorney Rudolph Giuliani. Sr. See DeVecchio, supra, at 124, 182 ("We couldn't

have done it without Scarpa," and "'without Greg Scarpa, there would have been no Mafia Commission Case, and where would we all be now?'").[19]

At no time did the Government disclose that Giuliani had shielded DeVecchio from prosecution in 1976 when he was caught engaging in the illegal sale of firearms. See Alan Feur, For Ex-F.B.I. Agent Accused in Murder, a Case of What Might Have Been, N.Y. Times (April 15, 2006) ("Mr. DeVecchio sold old handguns to undercover officers, who later sought to charge him with a felony" and "the case against him was ultimately discarded without an indictment by officials at the highest levels of the Justice Department, a decision that the federal prosecutor in the original case says was largely made by Rudolph W. Giuliani").

According to undisclosed reports, DeVecchio "was arrested by undercover agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF) for selling two German Lugers valued at 60,000…." Peter Lance, Deal with the Devil: The FBI's Secret Thirty-year Relationship with a Mafia Killer 98-99 (2013) ("By statute it's a felony, punishable by up to five years in prison on each count, for 'any person except a…licensed dealer to engage in the business of…dealing in firearms'").

All attempts to prosecute agent DeVecchio by the Department of Justice were "thwarted by Rudolph W. Giuliani, then a thirty-two-year-old aid to Judge

---

[19] In his memoir, agent DeVecchio reveals that "from the day of our first sit-down [with Giuliani] and for the ensuing twelve years, Scarpa furnished incredibly valuable information that led to countless RICO convictions and life sentences; Title III bugs and taps; solutions of murders and other serious crimes, and the Mafia Commission Case…." Id. at 114.

Harold Tyler, the deputy general in Washington...." And, "just as with the series of Justice Department indictments of Gregory Scarpa, the illegal gun sale case against Lin DeVecchio 'went away.'" Id. [20]

According to one investigative journalist, DeVecchio later "repaid" Giuliani for his assistance by enlisting Scarpa to gather the evidence needed to prosecute Mr. Persico in the "Commission Case:"

> In the mid 1980's, when Giuliani, then the U.S. Attorney for the Southern District of New York, declared war on the Mafia, DeVecchio returned the favor by using Greg Scarpa to provide the probable cause that legalized most of the wiretaps used to convict three family bosses in the Commission case. That prosecution helped solidify Giuliani's reputation as a crime buster and advanced his political career exceptionally.

Lance, supra, at 101.

In this regard, The Government failed to disclose that Scarpa's information was the key to its theory that Mr. Persico was the "boss" of the Colombo family and a member of the "Commission:"[21]

> "Scarpa identified Junior Persico as the Boss of the Colombo Family, as well as the identity of five other Colombo capos and three buttons.

---

[20] According to case agent DeVecchio, his "lawyer persuaded a lawyer in the Department of Justice in Washington to drop the criminal charge. That lawyer in the Department of Justice was Rudy Giuliani." Lin DeVecchio and Charles Brandt, We're Going to Win This Thing: The Shocking Frame-up of a Mafia Crime Buster 74 (2011).

[21] Prior to receiving Scarpa's false information, however, all other "reliable" sources of the FBI had identified others individuals as being the "boss" of the Colombo family. See Brady Violations, supra, at 22-30. Truly, Mr. Persico would have never been charged in the "Commission case" had the government's not paid a treacherous serial killer to supply highly unreliable and false information against individuals [Mr. Persico] he knew to be a targets of the DOJ.

> Each name and rank was ammunition for enterprise probable. Who was actually the Boss had been a matter of speculation for us. Boss Joe Colombo was shot in 1971 and remained in a coma for seven years before he finally died, and we didn't know, for sure, who got the commission's blessing to take over."

DeVecchio, supra, at 110.

In addition, the Government failed to disclose records detailing the numerous benefitsand financial awards that were provided to Scarpa and DeVecchio for their work in bringing about the "Commission case" against Mr. Persico. [22] See Kira Zalan, Working With Killers: Peter Lance Explores the Secret World of FBI Informants, U.S. News & World Report (September 12, 2013) ("So the feds would argue that the deal with the devil was worth it. When you consider the entirety of murder and mayhem – the number of people he killed and the amount of money he made (in fact, I calculated he was paid over $1 million in 2013 dollars in taxpayer money), the question is: Was it worth it? In my opinion, absolutely not. There's no doubt that Gregory Scarpa Sr., the killing machine, got the benefit of the deal with the devil.")

Similarly, the Government withheld information showing that Scarpa and DeVecchio received bonuses as a result of Mr. Persico receiving a 100-year prison

---

[22] Zalan, supra ("Did he [Scarpa] serve time in prison? No, he [Scarpa] did 30 days in over 40 years of murder and racketeering," largely because the FBI protected him. And "I documented 26 separate homicides [of Scarpa] from 1980 to 1992," although he [Scarpa] "told his killing partner Larry Mazza that he stopped counting after 50 murders").

sentence.[23] As agent DeVecchio now admits, "after [Mr. Persico's] sentencing we all received letters of commendation and bonuses from headquarters," which included a personal "$1,600 [award] and Scarpa got a few thousand." See DeVecchio, supra, at 152.

Overall, the Government intentionally suppressed devastating evidence showing that Giuliani's historically inaccurate "Mafia Commission Case" was unworthy of reliability given that the investigation was led by a rogue FBI agent and his paid serial killer informant, who were paid liars that intentionally shifted blame to Mr. Persico for murders they had actually committed together. [24]

G. The Government failed to disclose evidence proving that Fred DeChristopher committed perjury regarding his motive for cooperating against Carmine Persico

The Government suppressed information demonstrating that Fred DeChristopher committed perjury at Mr. Persico's trial when testifying about his motive for cooperating. The Government failed to disclose evidence proving that

---

[23] Notably, the Government failed to provide this information under its *Giglio* obligation, although agent DeVecchio testified at Mr. Perisco's trial.

[24] Indeed, Mary Bari--a murder victim of DeVecchio and Scarpa--would likely have been alive today had Giuliani not intervened in the FBI investigation against DeVecchio in 1976. See Alan Feur, For Ex-F.B.I. Agent Accused in Murder, a Case of What Might Have Been, N.Y. Times (April 15, 2006) ("But if Mr. DeVecchio had been pursued in 1976, would he have risen to lead the F.B.I. squad that hunted the Colombo crime family? Would he have had a role in some of the government's watershed cases against the mob? Would he now stand accused of second-degree murder?")

besides "the $50,000 reward, DeChristopher had his own crazy personal reason for cooperating" against Mr. Persico. See DeVecchio, supra, at 149.

According to FBI case agent DeVecchio, the undisclosed "reason besides the $50,000 reward and his desire to be with Patricia that made Freddie call his former handler Jim Nelson in L.A. to turn Junior in, is that Freddie was stealing from Junior's stash upstairs in the house." Id.

Agent DeVecchio now admits that the FBI was aware at the time of the "Commission Case" that "Freddie was stealing from the stash a little at a time, and ended up with quite a chunk hidden in another part of the house." Id. at 224; see also id. at 189 (another "reason Fred DeChristopher turned against Junior Persico" was that "Freddie had a shipboard romance with a honey named Patricia. After the cruise, he began having an affair with her" and "what bothered Freddie was that he was cooped up and couldn't get free to see his lovely Patricia").

At no time did the Government disclose that DeChristopher volunteered to falsely testify against Mr. Persico in order to (1) conceal his thievery, and (2) gain the support of the FBI that would prevent him from ever repaying the monies stolen. The Government also failed to disclose that when DeChristopher contacted the FBI to inform on Mr. Persico, "Downtown Kenny Brown" and DeVecchio "hid Freddie in a motel the first Sunday he'd left his house, and [they] got a case of beer and Chinese food, and had a blast." Id. (DeVecchio noted that "You'd get fired for that [conduct] today").

Notably, the Government not only remained silent about the information it possessed regarding DeChristopher's motive to falsely testify against Mr. Persico, but Giuliani's trial prosecutors also knowingly allowed DeChristopher to commit perjury on this subject. At trial, DeChritopher falsely testified that he did not steal any money from Mr. Persico:

> Q:   Sir, when you decided to turn in Carmine Persico during February of 1985, do you maintain that the 200,000 was just where you placed it?
>
> A:   I would swear to it.
>
> Q:   You are now. You are under oath now.
>
> A:   Yes, Sir.

Trial Tr. 1590

***

> Q:   And is it your testimony before this jury that when you left that house, you left all of the $200'000 in the home just where you had originally placed it in October of 1984?
>
> A:   Exactly, sir.

Trial Tr. 1601

***

> Q:   Mr. Dechristopher, isn't it true that you stole the 200 thousand that was in your ceiling, that you turned me in for the 50 thousand dollars, and that you came here to lie about me so that you could be with Pat, is that true?
>
> A:   That's not true, Junior.

Trial Tr. 1928

## H. The Government Failed to Disclose Evidence that FBI Agent Joseph Pistone Had Participated in Acts of Violence, Extortion, Obstruction of Justice, Hijackings, and a Conspiracy to Murder Bruno Indelicato

In 2007, FBI Agent Pistone first revealed that he had withheld information from certain members of the Department of Justice, Courts and Defense bar, because he did not want to compromise the numerous trials, including Giuliani's "Commission Case," which would be prosecuted in the 1980s. According to FBI Agent Pistone, he did not want certain information involving his criminality to be a fertile "field for cross-examination by defense attorneys in the trials that were then ongoing and upcoming." Joseph D., Pistone and Charles Brandt. Donnie Brasco: Unfinished Business: Shocking Declassified Details from the FBI's Greatest Undercover Operation and a Bloody Timeline of the Fall of the Mafia preface, 16 (2007).

As further explained in Pistone's memoir, "Perhaps out of a sense of self-protection, as a citizen and witness, he omitted some things and glossed over other, such as his participation in armed hijackings, beatings, and other daily Mafia activity. He played close-to-the-vest those intense feelings such activity engendered in him as he took part in them. Id., see also id. at 17 (Agent Pistone further explains, "I've got to be careful what I tell you. It's not beyond some prosecutor to read it and decide they want to do something.")

At no time did the FBI reveal to Mr. Persico's defense that one of its star witnesses, publicized by the U.S. Attorney's Office (S.D.N.Y) as a hero for being

47

an undercover informant of the "Mafia," [25] had engaged in unauthorized hijackings, drug dealing, and a murder conspiracy targeting Mr. Persico's co-defendant, Bruno Indelicato.

Agent Pistone now reveals, "My participation in Mafia hijacking has always been an open sore for me, something I have hesitated to talk about until now. Any involvement in hijacking was very much unauthorized by the Bureau." Id. at 37. He also admits that, at times "I was involved with drug deals was when Sonny and Lefty were also involved…." Id. at 69.

Most devastating amongst the Government's withholdings is Agent Pistone's admission that before testifying at Mr. Persico's trial, he had engaged in an unauthorized plot conspiring to murder co-defendant Bruno Indelicato. Agent Pistone recalled that one "bad incident nobody knows a thing about" including my handlers is that "I was guilty of once conspiring to murder Bruno, and committed an overt act in furtherance of such plot." Id. at 61-65.

Agent Pistone explained, "I had long ago made my decision of what to do when this predictable occasion arose. If Bruno's there, he's gone. *If I have to put a bullet in his head, I will*, and I'll deal with the federal government and Staten Island D.A. later." Id. (*emphasis added*).

Notably, Agent Pistone also recently exposed that the true motivation behind the Government's suppression of evidence relating to his true criminal

---

[25] Agent Pistone has claimed, "I made Rudy Giuliani a star." Id. at 15.

history was solely to convince the jury in the "Commission Case," among other trials, that he was a credible eyewitness without any negative baggage:

> "*I was an eyewitness to that indispensable proof in a RICO trial. And the source of that proof brought no negative baggage to the witness stand that could inject doubt or cause a jury to wonder about the truth….and the jury understood that.*"

Id. at 238. (*emphasis added*).


III.  APPLICATION OF LAW

A.  MR. PERSICO'S 100-YEAR SENTENCE IS "SUBSTANTIVELY UNREASONABLE" UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION

The Court found that Mr. Persico had engaged in uncharged criminal conduct, and relying on that finding, imposed a sentence that was many times longer than one today's Guidelines would have recommended. But for the judge's finding of fact, the 100-year sentence imposed upon Mr. Persico would have been "substantively unreasonable" and therefore illegal. See Rita v. United States 551 U.S. 338, 372 (2007) (Scalia, J., joined by Thomas, J., concurring in part and concurring in the judgment) ("[T]here will inevitably be some constitutional violations under a system of substantive reasonableness review, because there will be some sentences that will be upheld as reasonable only because of the existence of judge-found facts").

In the instant case, Mr. Persico was never charged with committing any of the violent offenses and murders considered at sentencing. Nonetheless, the Court found that Mr. Persico deserved a 100-year sentence, because he had succeeded in "being an upper member" of the "Commission" through engaging in "acts of

violence and threats of murder." Sentencing Tr. at 24-25.  The Court stated that there was "no question" that Mr. Persico "sanctioned the use of killing for appropriate circumstances." Id. (explaining that DeChristopher had also testified that Mr. Persico voted on whether Carmine Galante should be killed).

In light of these judicial findings, the Court calculated a sentence that was much higher than a sentence based solely upon the jury's verdict. Consequently, Mr. Persico's constitutional rights were violated, and his sentence is "substantively unreasonable" under the Sixth Amendment. See Jones v. United States, 135 S. Ct. 8 (2014) (Scalia, J., joined by Thomas, J., and Ginsburg, J., dissenting from denial of certiorari) ("The Sixth Amendment, together with the Fifth Amendment's Due Process Clause, 'requires that each element of a crime' be either admitted by the defendant, or 'proved to the jury beyond a reasonable doubt'") (citing Alleyne v. United States, 133 S. Ct. 2151 (2013)).

The Sixth Amendment is violated when courts impose sentences that, but for a judge-found fact, would be reversed for substantive unreasonableness. The Supreme Court has never held that the Constitution permits "otherwise unreasonable sentences supported by judicial fact-finding, so long as they are within the statutory range." Jones, 135 S. Ct. at 9 ("The Courts of Appeals have uniformly taken our continuing silence to suggest that the Constitution does permit otherwise unreasonable sentences supported by judicial fact-finding, so long as they are within the statutory range.... This has gone on long enough").

The Court's reliance upon the Government's shoddy proof regarding Mr.

Persico's alleged involvement in uncharged criminal conduct and the uncharged triple murder involving Carmine Galante, was also inappropriate based upon its failure to inquire into the veracity of these allegations. At the very least, the Court had to undertake further fact-finding to determine whether there was any truth to the Government's accusations regarding the uncharged Galante murder, considering that at least one jurist had found that the evidence presented by the Government was nothing more than an analogy to the movie, "The Godfather," and "a movie script does not constitute the kind of proof required to sentence men to prison for one hundred years." Salerno, 868 F.2d at 545-546 (Bright, J., dissenting).

Ultimately, Mr. Persico's 100-year sentence remains unsupported in fact and "substantively unreasonable" as a matter of law. As a result, the Court's sentence must be set aside, even though the sentence fell within the statutory range of penalties available for the offenses for which he stood convicted.[26]

## B. MR. PERSICO'S 100-YEAR SENTENCE IS "ILLEGAL" UNDER THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE

The record reflects that the sentencing judge considered a number of uncharged allegations concerning Mr. Persico's criminal history that were materially false. Specifically, the Court found that Mr. Persico was the boss of the Colombo family since 1972 and had participated in a number of uncharged acts of

---

[26] See Jones, 135 S. Ct. at 9 (citing Gall v. United States, 552 U. S. 38, 51 (2007)) ("[A] substantively unreasonable penalty is illegal and must be set aside.")

violence and murder, including partaking in a conspiracy with other "Commission" members to kill Carmine Galante in 1979.

Prosecutors falsely told the Court that Mr. Persico was the boss of the Colombo family in the 1970s, and responsible for conspiring with "Commission" members to kill Carmine Galante in 1979, although several dozen FBI reports conclusively prove that Mr. Persico was never a member of the "Commission" during such timeframe. See Brady Violations, supra, at 21-29.

In addition, prosecutors falsely told the Court that Mr. Persico was responsible for the murder of Mary Bari, although case agent DeVecchio and his serial killer informant were later held responsible for Bari's death. See People v. Lindley DeVecchio, Ind. No 6825/05 (Brooklyn N.Y. 2006) (charging DeVecchio with conspiring to murder Mary Bari); Captain Stitch, DOJ-Judicial Crimes Against the People, Google eBook (May 1, 2014) ("Gregory Scarpa Sr. taught his son Gregory Jr. to be a criminal. One of the murders at which Gregory was present was when his father fired three bullets into the head of Mary Bari. DeVecchio had told the senior Scarpa that she was providing information to the FBI").

Similarly troubling, prosecutors falsely represented to the Court that Mr. Persico had ordered the killing of Thomas Spero, although the case agent possessed, but failed to disclose, highly exculpatory evidence identifying alternative

suspects responsible for Spero's murder.[27] See, Brady Violations, supra, at 38-40.

In this instance, prosecutors not only misrepresented that Mr. Persico was involved in the Spero killing, but also concocted a story that Mr. Persico had ordered Genarro Langella to carry out Spero's execution. The Government claimed that Spero was killed because he had in engaged in disloyal activities while Mr. Persico was imprisoned. See Gov't Sentencing Memo, at 23.

At all times, the Government knew that the sentencing allegations presented against Mr. Persico were factually inaccurate, but it decided to advocate the veracity of such falsehoods at its own peril. In this regard, the Government concealed the fact that virtually all of its sentencing arguments were built upon the word of agent DeVecchio and his unreliable serial killer informant Gregory Scarpa, Sr.[28]

Had the sentencing judge known that the Government's allegations concerning Mr. Persico stemmed from the word of serial killer Gregory Scarpa, Sr., it would have rejected such information as unreliable. It is highly unlikely that the sentencing judge could have entertained information given by agent

---

[27] The Government later charged others individuals with the murder of Thomas Spero. See Brady Violations, supra, at 38-43.

[28] The Government's investigation would have little credibility once it was revealed that the lead FBI agent gathered all his information--including for all Title III applications--from a paid informant who participated in a number of murders, and at times, had the FBI assisting him in doing so. The Government secretly endorsed Scarpa's and DeVecchio's criminal behavior, allowing them to commit crimes and perjury in order to construct a "Mafia Commission Case" that would warrant a presidential address with Giuliani at the forefront of the media spectacle.

DeVecchio or Scarpa, once it was revealed that they had actually committed at least one of the uncharged murders attributed to Mr. Persico and were notorious for falsely shifting blame to others for crimes that they committed. Alvarez v. United States, 808 F. Supp. 1066, 1094 (S.D.N.Y. 1992) ("The new evidence is therefore material because it not only raises questions about the credibility of the Confidential Informant, but also about the corroborating government agent.")

As the Honorable Gustin L. Reichbach of the N.Y.S. Supreme Court explained,

> Scarpa informed on rivals and those closest to him, including members of his own crew. And in keeping with his treacherous nature, he also provided information to the FBI that was purposely deceptive and untrue in an attempt to point the finger of accusation away from his own misdeeds and on to that of gang rivals. He provided information on the murder of Joe 'Brewster' DoDomenico and the attempt to kill Joe 'Waverly' Cacase without indicating that he himself was involved in both. Similarly, he blamed on others the murder of Nicky 'Black' Grancio that he had committed.

People v. Lindley DeVecchio, Ind. No 6825/05 (Order, dated November 1, 2007).

Ultimately, the Government's falsehoods concerning Mr. Persico's criminal conduct diminished the effectiveness of Mr. Persico's sentencing arguments and undermined the integrity of the entire sentencing process. See United States v. Harris, 558 F.2d 366, 374-375 (7th Cir. 1977)) (noting that the "[t]he fairness of the sentencing process is undermined by reliance upon inaccurate information....")

The unreliable information presented by the Government, and as contained in the Presentence Report, undermined the sentencing judge's ability to fairly

consider both mitigating and aggravating factors when determining an appropriate sentence.[29] See United States v. Malcolm, 432 F.2d 809, 816 (2d Cir. 1970) (holding that any "misinformation or misunderstanding that is materially untrue regarding a prior criminal record, or material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process").

The Supreme Court has explained that a judgment simply cannot stand when a prisoner "is sentenced on the basis of assumptions concerning his criminal record which were materially untrue," because "[s]uch a result, whether caused by carelessness or design, is inconsistent with due process of law...." Townsend v. Burke, 334 U.S. 736, 741 (1948).

Here, the Court's reliance upon false information concerning Mr. Persico's involvement in a number of murders rendered his 100-year sentence "illegal" under the Fifth Amendment's Due Process Clause. See United States v. Jackson, 649 F.2d 967, 981 (3d Cir. 1981) ("It is, of course, true that due process is violated if the sentence is based on extensive and materially false information"); United States v. Sanders, 812 F. Supp. 813, 815 (N.D. Ill. 1992) (a criminal defendant

---

[29] In this regard, it is not necessary for Mr. Persico to show that the Court explicitly relied upon all the false information provided by the Government in order to obtain sentencing relief. Rather it is sufficient if Mr. Persico shows that it was not improbable that the trial judge was influenced by improper factors in imposing sentence. McGee v. United States, 462 F.2d 243 (2d Cir. 1972); see also Harris, 558 F.2d at 375 (7th Cir. 1977) (holding that a "showing of explicit reliance on improper factors or erroneous information has not invariably been held a prerequisite to sentence relief under Townsend and Tucker").

possesses a "federal constitutional right to be sentenced on the basis of accurate

information); <u>United States v. Musa</u>, 946 F.2d 1297, 1306 (7th Cir. 1991) (holding

that "there is no question but that a criminal defendant has a due process right to

be sentenced on the basis of accurate information")

Based upon the sentencing record, it is abundantly clear that the sentencing

judge was influenced by false accusations concerning Mr. Persico's involvement in

specific instances of violence and murder. <u>See</u> Procedural History, <u>supra</u>, at 12-22.

As a result, the Court must set aside Mr. Persico's 100-year sentence.

## C. Mr. Persico's 100-year sentence is "Constitutionally Defective" as a result of the Government's failure to disclose exculpatory evidence

For the past 30 years, the Government has kept silent about undisclosed

<u>Brady</u> evidence that shatters the veracity of its self-proclaimed "Commission

Case." The Government had always possessed, but failed to disclose, highly

exculpatory evidence undercutting its theory that Mr. Persico, along with several

of his co-defendants, were members of the "Commission." [30] Notably, the US

Attorney's Office (S.D.N.Y.) proceeded with its prosecution against Mr. Perscio,

---

[30] <u>See</u> Brady Violations, <u>supra</u>, at 22-35; <u>see also</u> Wayne Barrett and Adam Fifield.
<u>Rudy!: An Investigative Biography of Rudolph Giuliani</u> 155 (2000) ("Rudy's
favorite mobster died in prison in 1992, but he would still come back to haunt the
prosecutor years earlier. In a 1997 federal racketeering and murder trial, assistants
from the U.S. Attorney for Eastern District alleged that Vincent 'the Chin'
Gigante was in fact running the Genovese crime family during much of the period
covered in the 'Commission' case" and during the trial,  "an assistant U.S.
Attorney played a tape of a conversation at Salerno's social club in 1984, in which
Salerno referred to Gigante as 'the boss'").

although he was, by all logical implication, not the leader of any organized crime family as a result of his imprisonment from January 27, 1972 to December 5, 1979, and from May 1981 to March 4, 1984.[31]

Specifically, the Government withheld over a dozen highly exculpatory FBI reports from Mr. Persico's defense concerning his alleged leadership of the Colombo family during the 1970s and 1980s. At no time did the Government disclose that it had received "reliable" information that the Colombo family was headed by several other individuals during the timeframe charged in the indictment, who by virtue of holding such position, were also identified as being representative members of the charged "Commission."

This undisclosed information would have, if believed by either the jury or sentencing judge, undercut the essential element that Mr. Persico was the "boss" of the Colombo family and a member of the "Commission" for the timeframe charged in the indictment, and severely mitigated Mr. Persico's sentencing culpability. See, e.g., United States v. Mejia-Mesa, 153 F.3d 925, 929 (9th Cir. 1998) (Here, if the "allegations are proven true, an essential element of the offenses charged in two of the three crimes of conviction may be lacking. An evidentiary hearing on [the petitioner's] Brady claim is thus required).

---

[31] Overall, the Government suppressed numerous pieces of evidence that directly undercut the veracity of the FBI's investigation into the "Commission Case," along with the theories presented by prosecutors at Mr. Persico's trial and sentencing proceeding. See Brady Violations, supra, at 22-49.

Had the Government fulfilled its *Brady* obligation, Mr. Persico could have at least taken steps to see that his conviction and sentence were not predicated on salient misinformation, a requirement of fair play which the Government's intentional withholdings prevented him from doing. See Perez v. United States, 968 A.2d 39, 66 (D.C. 2009) (The object of Brady is to "allow defense counsel an opportunity to investigate the facts of the case and, with the help of the defendant, craft an appropriate defense"); Townsend v. Burke, 334 U.S. 736, 741 (1948) ("In this case, counsel might not have changed the sentence, but he could have taken steps to see that the conviction and sentence were not predicated on misinformation or misreading of court records, a requirement of fair play which absence of counsel withheld from this prisoner").

In this regard, the Government not only withheld favorable source information proving that Mr. Persico was not the "boss" of the Colombo family, but it also failed to disclose the identity of at least three or more individuals identified in its reports that were eyewitnesses to the charged RICO offenses.

Specifically, the undisclosed FBI records identify multiple sources that were eyewitness to the affairs of the Colombo family during the 1970s and 1980s. These sources would have been able to provide favorable testimony undercutting the Government's case and sentencing arguments, and Mr. Persico had a constitutional right to know of their existence. See e.g., Gregory v. United States, 369 F.2d 185, 188 (D.C.Cir. 1966) ("Witnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense. Both sides have

58

an equal right, and should have an equal opportunity, to interview them"); <u>Boss v. Pierce</u>, 263 F.3d 734 (7th Cir. 2001) ("allowing the government to withhold favorable material evidence that it receives from defense witnesses upsets the balance <u>Brady</u> and its progeny strike. In effect, it would punish the defense for not obtaining evidence it had no reason to believe existed").

> As the Ninth Circuit has explained,
>
> A person who has actually witnessed a crime through any of his senses can either provide evidence which is favorable to the defense or which may tend to raise a reasonable possibility that the accused is guilty. Thus, it was quite appropriate for the district court to conclude from the fact that the government did not intend to call a witness to the crime that there was a reasonable possibility that such person would be able to provide evidence favorable to the defense. No further showing of materiality was required.

<u>United States v. Cadet</u>, 727 F.2d 1453, 1469 (9th Cir. 1984). Thus, the Government's failure to disclose the identity of its sources, or call them as witnesses during trial, automatically suggests that such witnesses would have been material to both Mr. Persico's defense and the Court's consideration at sentencing.[32]

---

[32] The Government's failure to notify Mr. Persico's defense of the identity of its sources not only violated <u>Brady</u>, but undercut Mr. Persico's Sixth Amendment right to compulsory process for obtaining witnesses in his favor at both trial and during his sentencing hearing. Compulsory process gives criminal defendants "the right to the Government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before the jury evidence that might influence the determination of guilt." <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 55–56 (1987).

The Second Circuit has held that the "right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." <u>Washington v.</u>

Additionally, the Government withheld material information relating to the leadership of codefendants Salerno, Furnari, and Langella. Of significance, these withholdings give credence to Mr. Persico's defense that he did not conspire with his codefendants in the 1970s to carry out the affairs of the "Commission," and could not have voted on the 1979 triple murder involving Carmine Galante together.

Specifically, the Government withheld reports proving that individuals other than Mr. Persico's codefendants sat on the "Commission" during the timeframe charged in the indictment. Notably, the Government has even conceded in post-trial proceedings that neither Salerno nor Furnari truly sat on the "Commission" during the relevant timeframe charged in Giuliani's "Commission Case." See Brady Violations, supra, at 30-36.

In light of these revelations, it was error for the sentencing judge to considerer statements made by these codefendants against Mr. Persico, because such statements could no longer be admissible as co-conspirator declarations. At this juncture, there is simply no way to mitigate the prejudicial impact that Salerno's inadmissible statements had upon Mr. Persico at sentencing. Indeed, the

---

Schriver, 255 F.3d 45, 56 (2d Cir. 2001); see also Taylor v. Illinois, 484 U.S. 400, 408 (1987) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense"); United States v. Valenzuela-Bernal, 458 U.S. 858, 866 (1982) ("[t]he prosecution may not deny access to a witness by hiding him out"); Freeman v. Georgia, 599 F.2d 65, 69 (5th Cir. 1979) ("If the state deliberately conceals an eyewitness to a crime, due process has been violated and habeas must be granted if, in the context of the entire trial, the missing witness' testimony was such as might have created a reasonable doubt which would not otherwise have existed").

sentencing Court made it perfectly clear that it was relying upon Salerno's surreptitiously recorded conversations when fashioning the 100-year sentence imposed upon Mr. Persico and his co-defendants.[33] See Sentencing Tr. 16-20.

Here, the undisclosed records were not only material to the leadership issues presented in the key RICO charges, but they also revealed the falsity of the Government's claim that Mr. Persico participated in a number of murders, including the allegation that he voted on the triple murder involving Carmine Galante.

The prosecution's disclosure of these FBI records would have foreclosed the Court from considering the Government's salacious murder allegations during sentencing, and if made available in a timely fashion, would have been devastating evidence undercutting the principal testimony against Mr. Persico on these subjects. See United States v. Mahaffy, 693 F.3d 113, 131 (2d Cir. 2012) (Aside from exculpatory material, Brady applies to material that "would be an effective tool in disciplining witnesses during cross-examination").

Specifically, both cooperator Cantulopo's and DeChristopher's testimony would have been substantially impeached as a result of these FBI records being disclosed, and the falsity of their testimonial account regarding Mr. Persico's

---

[33] During Mr. Persico's sentencing hearing, the Court explained, "we heard tapes....there's a tape with you [Anthony Salerno] on it saying you made the mob. 'If it wasn't for me today there wouldn't be anything left.'" Id. The Court further noted, "I have to fashion something that is a statement to those out there, some whose names on probably on these tapes but were not in this courtroom who are undoubtedly thinking about taking over the reins from the hands that have to may let them drop...." Id.

alleged leadership of the Colombo family at the time certain murders occured would have been exposed. The probative value of Mr. Persico disciplining both witnesses during cross-examination with the FBI's own records cannot be overstated. See e.g., Weintraub, 871 F.2d at 1257 (5th Cir. 1989) ("[T]he withheld impeachment evidence tended to undermine Emrick's trial testimony regarding the amount of cocaine Weintraub distributed....[and] [w]e conclude that the withheld impeachment evidence was material to Weintraub's punishment").

Here, the disclosure of FBI reports indicating that the "Commission" had appointed another "boss" of the Colombo family would have undermined the testimony of Fred DeChrisotpher, who testified that Mr. Persico was the boss of the Colombo family since 1972 and had appointed "acting bosses" when he was imprisoned during such timeframe.[34] Tr. 1542-1547. The false testimonial account of cooperator Cantulopo that Mr. Persico was the "boss" since 1972, see Tr. 930, would have been similarly devastated by the Government's disclosure of these reports.

In addition, cooperator DeChristopher's testimony regarding Mr. Persico's alleged vote on Carmine Galante's murder would have also been proven untrue, because Mr. Persico did not sit on the Commission in 1979.[35] Tr. 1157

---

[34] Similarly, DeChristopher's testimony that Mr. Persico had told him about disputes with alleged boss Tony Salerno would also be proven false, since FBI reports indicate that Salerno was not the boss of the Genovese family. Tr. 1546.

[35] Moreover, the Government's knowing use of DeChristopher's perjurious testimony--shielding his true motive to cooperate against Mr. Persico--would have

(DeChristopher testified that Mr. Persico told him "I voted against him [Carmine Galante] getting hurt").

Ultimately, the Government's nondisclosures relating to DeChristopher are material under a proper <u>Brady</u> analysis, because he provided the key evidence linking Mr. Persico to both the charged enterprise and the Galante murder. His testimony was the linchpin to the Government's legal argument connecting the Galante murder to the "Commission"---providing the testimony needed to prove that the offense was somehow related to the charged enterprise. [36] See <u>United States v. Salerno</u>, 868 F.2d 524, 533 (2d Cir. 1989) ("The testimony of Fred DeChristopher concerning appellant Persico's statement that he had voted against

---

solidified the Court's rejection of his testimony when fashioning Mr. Persico's sentence. <u>See</u> Brady Violations, <u>supra</u>, at 44-45. The trial prosecutors engaged in deception to conceal DeChristopher's motives, and as a result, "[n]o matter how good defense counsel's argument may have been, it was apparent to [both] the jury [and] [Court] that it rested upon conjecture a conjecture which the prosecutor disputed." <u>Boone v. Paderick</u>, 541 F.2d 447, 451 (4th Cir 1976); <u>See also</u> <u>United States ex rel. Annunziato v. Manson</u>, 425 F.Supp. 1272, 1279 (D.Conn. 1977) (noting that "in the face of a [cooperator's] denial as to the existence of any promise and the suppression by the prosecution of the full terms of the deal, defense counsel's argument challenging the [witness's] motive and interest was reduced to speculation and inference.")

[36] The Supreme Court has made clear that where "the eyewitness's testimony was the only evidence linking [the defendant] to the crime, and the eyewitness's undisclosed statements contradicted his testimony," such statements are "plainly material, and the State's failure to disclose those statements to the defense thus violate[s] <u>Brady</u>."[36] <u>Cain</u>, 132 S.Ct. at 629; <u>see also</u> <u>United States v. Fisher</u>, 106 F.3d 622, 634-35 (5th Cir. 1997) (finding <u>Brady</u> violation where government failed to disclose interview with an individual who was not called as a witness at trial, which undermined credibility of witness whose testimony was key to one of the counts of conviction).

the Galante murder provided evidence that the Commission had taken a vote on the matter").

Aside from its cooperators, the Government's withholdings are equally devastating to the credibility of FBI agents Lindley DeVecchio and Joseph Pistone. See Brady Violations, supra, at 36-38, 40-44, 46-48.

Specifically, the Government's concealment of the agents' extensive criminal behavior and participation in multiple murder conspiracies was material to both their credibility and the veracity of the FBI's investigation into the alleged enterprise. The Government's case would have little credibility once it was revealed that the lead FBI Agents had each undertaken plans to engage in unauthorized acts of murder, and at one time, had targeted Mr. Persico's co-defendant. See Pistone, supra, at 61-65 (Agent Pistone stating that he would have "put a bullet in Bruno's head," and that he actually conspired to do so, while he was an FBI agent actively investigating the case); Lance, supra, at 120 (detailing Agent DeVecchio's participation in the murder of Mary Bari).

In the end, there is truly nothing historic about Rudy Giuliani's concocted "Commission Case," except that it represents one of the greatest injustices ever perpetrated by the Department of Justice. The Government's flagrant and systemic Brady violations in the "Commission Case" illustrate a historically plagued time in our judicial system, where a "win at all cost" attitude overshadowed the search for truth and justice in Italian organized crime prosecutions.

Even today, the degree of animus that has developed towards non-cooperating Italian defendants accused of being associated with the "Mafia" is astounding to behold--animus that is embedded at the top levels of the federal government. [37] See e.g., FBI's role in convictions called 'shocking', Washington Post & Associated Press (July 27, 2007) ("U.S. District Judge Nancy Gertner said the FBI knew that the star witness in a murder trial--a 'top echelon' informant in the agency's war against the Mafia--was lying when he identified four men as being responsible for the 1965 slaying of Edward 'Teddy' Deegan, a small-time thug shot in an alley. But the judge said agents vouched for the witness' credibility and for years covered up the lie as the defendants tried to prove their innocence…. the FBI considered the four 'collateral damage' in its war against the Mafia, the bureau's top priority…"); People v. Lindley DeVecchio, Ind. No 6825/05 (Order, dated November 1, 2007) ("what is undeniable was that in the face of the obvious menace posed by organized crime, the FBI was willing, despite its own formal regulations to the contrary, to make their own deal with the devil. They gave Scarpa virtual immunity for close to 15 years in return for information, true and false, he willingly supplied").

Here, "the government suppressed numerous pieces of evidence in its possession which was both exculpatory and impeaching," and "there is a

---

[37] "The term Mafia is actually an acronym for a 12th-century Italian slogan assailing what the Italians believed was French oppression." See Michael Oreskes, Commission Case Illustrates Changes in Attitude on Mafia, N.Y. Times (September 20, 1986).

reasonable probability that if the evidence had been disclosed, the outcome of the proceeding would have been different." United States v. Triumph Capital Group, Inc., 544 F.3d 149, 164 (2d Cir. 2008). And even if it "is by no means certain that" arguments based on the wrongfully withheld evidence "would have swayed the jury" in the "Commission Case," it is a real "possibility to undermine confidence" in both the verdict and Mr. Persico's 100-year sentence.

Ultimately, the favorable evidence withheld by the Government could reasonably be taken to put the whole case in such a different light as to undermine confidence in the Court's judgment.[38]

Accordingly, Mr. Persico's 100-year sentence must be set aside.

---

[38] Since Brady is a rule of fairness, the materiality threshold is met if, in the absence of proper disclosure, the petitioner shows that he did not receive a fair trial. The Brady materiality test is simply "not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Kyles, 514 U.S. at 434-35.

The Eleventh Circuit has also explained that Brady materiality cannot be determined item-by-item:

> [I]t is essential that the process not end after each undisclosed piece of evidence has been sized up. The process must continue because Brady materiality is a totality-of-the-evidence macro consideration, not an item-by-item micro one. . . .Cumulative analysis of the force and effect of the undisclosed evidence matters because the sum of the parts almost invariably will be greater than any individual part.

Smith v. Secretary, Dept. of Corrections, 572 F.3d 1327, 1346-47 (11th Cir. 2009)

D. ADDITIONAL DISCOVERY SHOULD BE ORDERED BY THE COURT PRIOR TO
THE ADJUDICATION OF MR. PERSICO'S MOTION FOR SENTENCING RELIEF
PURSUANT TO FED. R. CRIM. P. 35(A)

For three decades, Mr. Persico has dealt with the consequences of former
US Attorney Rudolph Giuliani's unjust crusade against him, and unevenly
defended against a wellspring of Government endorsed falsehoods presented by
unreliable informants and corrupt FBI agents. The unjust tarnishing of Mr.
Persico's reputation, however, is of little consequence in comparison to the past
thirty years of his imprisonment and separation from his wife, children, and
grandchildren.

As of 2015, the time has finally come for the Government to provide all
undisclosed evidence favorable to Mr. Persico's defense, and to answer for its (1)
continued failure to disclose highly exculpatory evidence to Mr. Persico's defense,
and (2) use of salaciously false allegations to deprive Mr. Persico of his freedom.

At this juncture, it would be appropriate for the Court to order the
Government to fulfill its Brady obligation before Mr. Persico's request for relief is
decided. See Leka v. Portuondo, 257 F.3d 89, 100 (2d. Cir 2001) ("Brady requires
disclosure of information that the prosecution acquires during the trial itself, or
even afterward"); Milke v. Ryan, 711 F.3d 998, 1019 (9th Cir. 2013) (requiring, on
remand, the state to make complete *Brady* disclosures regarding the subject police
officer and to "provide a statement under oath from a relevant police official
certifying that all of the records have been disclosed and none has been omitted,
lost or destroyed").

The importance of affording Mr. Persico a full and fair sentencing process cannot be overstated, particularly since he is serving a virtual life sentence for extortion offenses, for which a number of newly discovered FBI reports demonstrate his actual innocence. The cumulative effect of undisclosed <u>Brady</u> evidence, when coupled with the Government's falsehoods and inaccurate sentencing arguments, demonstrates that the 100-year sentence imposed by the Court is unjust and unworthy of confidence.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court vacate Mr. Persico's 100-year sentence pursuant to Federal Rule of Criminal Procedure 35(a), because the sentence imposed was (1) "substantively unreasonable" under the Sixth Amendment, (2) predicated upon a number of factual inaccuracies in violation of the Fifth Amendment's Due Process Clause, and (3) constitutionally defective as a result of the Government's failure to disclose favorable information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.

Dated:   White Plains, New York
         July 13, 2015

Respectfully submitted,

Anthony DiPietro, Esq.
*Counsel to Carmine Persico*
Law Office of Anthony DiPietro
15 Chester Avenue
White Plains, New York 10601
(914) 948-3242

68

<u>CERTIFICATE OF SERVICE</u>

I, Anthony DiPietro, Esq., being over eighteen and not a party to the action, affirm that on July 13, 2015, I served a copy, via United States Postal Service (USPS), of the Petitioner's Notice of Motion, Affirmation of Counsel, Memorandum of Law and Supporting Exhibits on:

> U.S. Attorney Preet Bharara
> United States Attorney's Office (S.D.N.Y.)
> 1 St. Andrews Plaza
> New York City, NY 10007

Dated: White Plains, New York
     July 13, 2015

                                          Anthony DiPietro
                                          *Counsel to Carmine Persico*
                                          Law Office of Anthony DiPietro
                                          15 Chester Avenue
                                          White Plains, New York 10601
                                          (914) 948-3242